## Case No. 757.

### BAIRD v. BYRNE.

[3 Wall. Jr. 1.][1]

Circuit Court, D. Pennsylvania. Oct. Sessions, 1854.

JURISDICTION—NATURALIZATION — FOREIGN ALLEGIANCE.

A mere "declaration of intention" by an alien, under the naturalization laws of the United States, to become a citizen, &c., and to renounce all allegiance to a foreign, his natural sovereign, in a judicial point of view, is not sufficient of itself, and without being perfected by an actual renunciation, to prevent such alien from being regarded as a "foreign citizen or subject," within the meaning of that clause of the constitution which gives jurisdiction to the courts of the United States over controversies between the citizens of a state and "foreign citizens or subjects." This point ruled at nisi prius, in a special case, and with the expression of a readiness on the part of the court to hear it more solemnly argued.

[Cited in Betzoldt v. American Ins. Co., 47 Fed. 706.]

[See Lanz v. Randall, Case No. 8,080.]

By the act of congress, on the subject of naturalization, (Act April 14, 1802, c. 28, § 1; 2 Stat. 153,) any alien, being a free white person, may become a citizen of the United States by declaring before certain courts prescribed by the act, his bona fide intention to become such citizen, "and to

renounce forever all allegiance and fidelity to any foreign prince, potentate, state or sovereignty whatever, and particularly by name the prince, potenate, state or sovereignty whereof such alien may at the time be a citizen or subject;" and then at the expiration of three years, under certain provisos, making oath to support the constitution of the United States, and that he doth absolutely and entirely renounce and abjure such allegiance, &c.

With this law in force, Byrne, the defendant, a native of Ireland, came to this country in the spring of 1849, and immediately, on the 7th of April of that same year, made in the proper court the required declaration of his intention, and particularly of his intention to renounce his allegiance to the queen of Great Britain and Ireland. Soon afterwards he took up his abode in Philadelphia, where, with his father, he continued to reside. In 1853 he was elected captain of a volunteer company of Philadelphia troops, and as such was commissioned by the governor of Pennsylvania, and he frequently and uniformly declared, and this with emphasis and warmth, that he had thrown off his allegiance and ceased to be a subject to the queen of Great Britain and Ireland. He was thus residing here when, in April, 1853. this suit was brought by Baird, a citizen of Pennsylvania, before the expiration of the term of residence required by law as precedent to the final act of naturalization.[2]

"The judicial power" of the United States courts extending by the constitution (article 3, § 2, par. 1) to controversies between the citizens of a state, and foreign states, citizens or subjects, the question in this case, which arose on a plea to the jurisdiction, was whether the defendant was, when the suit was brought, a foreign subject, and as such within the jurisdiction of the United States courts; or, in other words, whether a person born in a foreign country, and owing allegiance to its sovereign, who emigrates to this country with the intention of becoming a citizen, can by his voluntary act, without the concurrence of his native government, throw off his allegiance, so as to cease to be a foreign subject, after he has made his declaration on oath of his intention to renounce that allegiance, and before the final act of naturalization.

Mr. Penrose, for the defendant, Byrne.

I. The circuit court is of limited jurisdiction, having cognizance only in a few cases. So strictly have the United States courts been confined within the limits prescribed, that it has been held, under the provision

---

[1] [Reported by John William Wallace, Esq., and here reprinted by permission.]

[2] On the expiration of the proper term, Byrne actually became a citizen; but on the breaking out of the war between Great Britain and Russia he went abroad, without any intention of returning to the United States, and entered into the military service of the emperor of Russia.

that the court shall have jurisdiction in controversies between citizens of different states, that neither the District of Columbia, nor a territory, is a state within the meaning of the constitution. Seton v. Hanham, Charlt. R. M. 374; Hepburn v. Ellzey, 2 Cranch, [6 U. S.] 445; New Orleans v. Winter, 1 Wheat. [14 U. S.] 91; Wescott v. Fairfield Tp. [Case No. 17,418.] Assuming, then, that if Byrne was, at the time of the commencement of this suit, not a subject of the queen of Great Britain, this court had no jurisdiction, let us inquire:

II. Was he at this time such a subject? It is not necessary to show affirmatively that he was a citizen, or even a subject of the United States. Whatever might be said in favor of that position, this case requires us only to show that he was not a subject of the queen of Great Britain and Ireland. We can expect no assistance from English authorities or decisions. A country which executed as a traitor a person born of French parents who were temporarily in England on a visit, because he was found in the army of his own country fighting against England; which maintains even now, that a child born in the United States, of an American mother, is a British subject, because its father, though a naturalized citizen, happened to have been born in England—such a country cannot be expected to aid much in discussing here a question of American citizenship. We have uniformly, and in the most decisive manner, repudiated as unjust and antiquated, the dogmas of England on the subject of allegiance. We have a code of our own upon that subject, and with a federal court interpreting the federal constitution, the only question will be, what is the American view? We have sent as an American minister, one Frenchman, Mr. Galatin, to the court of France; and another Frenchman, Mr. Soule, to the court of Spain; and by the law of allegiance, as laid down in England, our present minister in London is a subject of the British queen. The English courts, whose decisions ever run in parallelism with English interests, may decide what they please. We settle the law on some subjects for ourselves.

The case of Martin Koszta, though a diplomatic and not a judicial case, is in point. See The Washington Union, Extra, Sept. 29, 1853. Koszta, by birth an Austrian subject, had been engaged in an unsuccessful attempt at revolution against the emperor of Austria; and fleeing from the Austrian dominions to Turkey, had, in 1851 or thereabouts, come by agreement of the emperor to the United States, on condition that he should not again set foot on Ottoman soil. In July, 1852, he made the usual and proper declaration here of his intention to become a citizen of the United States, and to renounce all allegiance to any other state or sovereign, and particularly to the emperor of Austria. After remaining here about two years, he returned to Turkey for purposes of private business of a temporary kind, where he placed himself under the protection of the American consul, who gave to him a tezkera, or kind of passport or letter of safe conduct. Soon after this he was seized by agents of the emperor of Austria, and against his will, put on board an Austrian ship of war, to be taken into the Austrian dominions. Captain Ingraham, commanding an United States sloop of war, demanded his release under threat of a resort to force if the demand was not complied with by a certain hour. The prisoner was surrendered by the Austrian sloop to an agent satisfactory to Captain Ingraham, and he came afterwards to America. This interference was complained of by Austria, which declared that it "could not consider the individual in question as belonging to a foreign jurisdiction so long as the ties which bound him to his country were not legally dissolved." And that even if Koszta "could, without violating the laws of his own country, of his own accord, and without any other formality, have broken asunder the ties which bind him to his native soil," yet in this case he had "done nothing more than declare his intention of becoming a citizen of the United States, and with that object in view, of renouncing his rights of nationality in the states of the emperor." But how was this doctrine answered by our government? It declared, on the subject of allegiance generally, that the sounder and more prevalent doctrine is "that the citizen or subject having faithfully performed the past and present duties resulting from his relation to the sovereign power, may, at any time, release himself from the obligation of allegiance, freely quit the land of his birth or adoption, seek through all countries a home, and select anywhere that which offers him the fairest prospect of happiness for himself and his posterity." And while it was not contended that the "initiatory step in the process of naturalization invested him with all the civil rights of an American citizen," such step was declared to "be sufficient, for all the purposes of this case, to show that he was clothed with an American nationality, and that in virtue thereof the government of the United States is authorized to extend to him its protection at home and abroad." The government accordingly defended the acts of all its agents; not only of Captain Ingraham, who claimed possession of a man having an American tezkera or passport (which was enough to justify him), but of the American consul, who, on learning of Koszta's mere "declaration of intention," had so far regarded him as an American citizen as to give him a document usually given to citizens alone. Indeed, the secretary of state afterwards went further than he need have done for this case, in saying that mere domicile, animo manendi, or without any present intention of removing herefrom, gave such nationality.

Now, if Koszta was an Austrian, and "a foreign subject," what right had our government to prevent Austria's final control of him? By interfering as it did, completely and thoroughly, our government declared in an emphatic manner that he was not an Austrian subject; that whatever new character he might or might not have as yet acquired, he had lost his old one. No doubt, as a legal view, this, merely on our principles of allegiance, was right. We can well conceive, under our laws, of inchoate or initiate citizenship; and inchoate American citizenship is inconsistent with the completeness of any foreign subjection; perhaps with its existence at all. A man, it is true, must have a domicile somewhere; and he must have perhaps a national character. But it has not been decided that he must necessarily be a citizen totus, teres atque rotundus; invested with all political and civil rights of citizenship of the most favored class. Citizenship, under the American view, may be in a state of transition, which is enough for our purpose; though the more true view, in respect of legal analogies, is the one above mentioned, st. that of citizenship initiate. The alien has undoubtedly certain political rights by the mere declaration of intention; for he has a right, at the end of three years thereafter, on complying with certain terms, to become a citizen complete. His case finds a legal analogy in that of a tenant by the curtesy; who has no rights till the birth of issue; and no perfect rights till the death of the wife.

But a man may be a subject within the terms of the constitution, and yet not be a citizen within the naturalization or any other laws. Koszta, though not a citizen within these or any other laws, was so far a subject that he claimed and received the most ample protection of our government; a protection which certainly we do not extend to the subjects of foreign powers. We justified an act of war for this man. Our government "in discharging" what it called "its duties of protection," regarded him as its subject, bound by its laws, and bound to act as it directed. Great Britain and the United States have millions of subjects who are not citizens at all. Many of the people of the East, and some, probably, of the West India isles, are British subjects, but not British citizens.

It must be recollected, that the delay after thus making the declaration, before the alien becomes a citizen, is not of his own seeking. He does not say, "I don't intend to become a citizen now, but will consider the subject a little and see whether I will give up my allegiance to my native country." He is willing and anxious to become a citizen at any time; but the United States, for their own protection, and to prevent persons inexperienced in our institutions and mode of carrying on our government from interfering in a matter they don't understand, requires a term of probation, during which they may learn more of our affairs, and thus become better fitted for taking part in them. No foreigner who has declared his intention of becoming a citizen, would be unwilling to have the process completed at that same time. The simple act of swearing to an intention to renounce all allegiance to the queen of Great Britain and Ireland, is an act inconsistent with the idea of any further continuance of that allegiance.

It has been held, that after making the declaration of intention, there must be a continued and uninterrupted residence of five years in this country; and that any absence, however short, is sufficient to prevent subsequent naturalization. Now it would be unjust thus to require a man to remain here, and yet to assert at the same time that he was a foreigner, and not entitled to protection as a citizen of the United States. Is this requiring him to remain here consistent with the idea that our law considers him as remaining a foreign subject? This government, we have seen, has avowed its intention not to be guilty of this injustice; and further, that it will protect such persons and redress their injuries, even should those injuries be inflicted by the country claiming the allegiance. It can scarcely be that we would avow a doctrine in our intercourse with foreign nations, which we reject when applied to ourselves. That we should say to England "Mr. Byrne is entitled to our protection even against you, because he has ceased to be your subject," and yet, when he, himself, here asserts that he is not a subject of England, that we should deny it and say that he was.

If we look at the light in which a person, thus making a declaration of intention to become a citizen, is viewed by the statutes of the United States, we shall find that he is in no place considered as remaining a foreign subject, but that he is vested with certain rights which are entirely inconsistent with such an idea. The act of 26 March, 1804, [2 Stat. 293,] § 2, says: "When any alien who shall have complied with the first condition specified in the first section of the said original act" (that is, who has declared his intention, &c.), "and who shall have pursued the directions prescribed in the second section of the said act, may die before he is actually naturalized, the widow and children of such alien shall be considered as citizens of the United States, and shall be entitled to all rights and privileges as such upon taking the oaths prescribed by law."

Such a right as that given by the statute would scarcely have been given to the wife and children of a person owing allegiance to a foreign government: and it seems from this that it was thought that he ceased to be a foreign subject from the moment of making his declaration. This shows, too, that it is merely to prevent his voting that he is not naturalized at once, and that it was thought that from the time he makes the declaration he ceases to be a subject of the foreign gov-

ernment, and begins to become an American citizen, clothed with all the civil rights of the citizen, but from his inexperience not yet intrusted with the political rights. The expression "actually naturalized," is significant. It admits a naturalization short of actual or complete naturalization, a naturalization in law, or a naturalization for many purposes.

So, also, the patent act of July 4, 1836, § 12, [5 Stat. 121,] provides, "that any citizen of the United States, or alien who shall have been a resident of the United States one year next preceding, and who shall have made oath of his intention to become a citizen thereof, and who shall have invented any new art, &c., and shall desire further time to mature the same, may, on payment of the sum of $20, file in the patent office a caveat, setting forth the design," &c. Here there is a right given equally to aliens who have declared their intention, &c. and to citizens of the United States, from which right all other aliens are excluded. This seems to favor the view we have taken; but the 9th section of the act is still stronger. It is as follows: "That before any application for a patent shall be considered by the commissioner, the applicant shall pay into the treasury of the United States, or into any of the deposit banks to the credit of the treasury, if he be a citizen of the United States, or an alien, and shall have been resident in the United States for one year next preceding, and shall have made oath of his intention to become a citizen thereof, the sum of $30; if a subject of the king of Great Britain, the sum of $500, and all other persons the sum of $300." This act speaks of three classes of persons, viz.: Citizens and aliens who have been a year resident within the United States, and have declared their intention of becoming citizens thereof. 2d. All other aliens, except subjects of the king of Great Britain. 3d. Subjects of the king of Great Britain. Now Byrne must belong to one of these classes, and to one only. And being one of the persons described in the first class, no one will say that the act considers him as belonging to the third class also. If he be not of the third class, then has the plaintiff failed to prove the facts alleged in the record, and to repel the presumption of the want of jurisdiction.

Mr. Ingraham, on the other side, contended that the declaration of an intention to renounce, &c., was not a renunciation. It was, indeed, a thing of the least possible significance. The party might perfectly well change his intention. This locus penitentiae was given to him designedly; that he might see whether he knew his own mind. The omission of the party to carry out his intention involved no penalty from our government; nor would the existence of the declaration itself infer any penalty from his own. An intention to renounce at the end of five years is consistent with a continuing allegiance during the five years. Nay, it is inconsistent with any renunciation before the expiration of five years. Even the party himself, therefore, did not renounce his allegiance. If he had, it would be a nullity. He can make no renunciation not acknowledged by the law, and the law will not allow him to renounce it before the end of five years. The country could not accept it. If, then, the party does not renounce his old allegiance, and the country does not accept any new allegiance, in what way does his old allegiance cease? There is a fundamental error on the other side in supposing that a declaration of an intention to renounce is identical with an actual renunciation. The declared intention may not exist. A real intention may change, as we have said. This very case proves the truth of our argument. Byrne declared his intention to become a citizen of the United States, but abandoned the country soon after, and is a soldier in the army of the emperor of Russia, without the least intention of ever coming back here.

The case of Koszta was not a precedent. It was a political, not a judicial case. The fact that Koszta was on a neutral territory, Turkey, with an American passport, was enough to justify our government in saying to Austria, who had arrested him by main force, against the complaint of Turkey, "You have treated our 'protection' with indignity;" and in justifying in the eyes of the world, at least, a gallant officer of our navy who, with patriotic motives, had compelled a surrender of the man to the government with whose sign of protection he was invested.

The acts of congress which have given some privileges to persons declaring intention are of no significance, either as facts or arguments. Congress may favor such persons, as it has in special cases favored aliens who had made no declaration at all. An act by congress can't amount to an act by an individual no way connected with congress: nor can acts of congress, having nothing to do with the naturalizing of aliens, cause the transfer of allegiance from one sovereign to another. The very sections of both the acts relied on speak of persons who have done no more than "declare intention" as "aliens." They favor our view more than they do that of the other side.

GRIER, Circuit Justice, admitted that the question, as a judicial one, was new, and of some difficulty; but it being, as he stated, his opinion that a man could not throw off his natural allegiance except in assuming some new citizenship, he refused to dismiss the case in a summary way, for want of jurisdiction. And there being no disputed facts in the case, he directed a verdict for the plaintiff, giving leave, however, to the defendant to move to set it aside if he desired. The motion was made; but Byrne having actually abandoned this country soon after the suit was brought, and there not being any like-

lihood whatever of his return, the case was not heard of further.

NOTE, [from original report.] The conclusion thus adopted by the court in this case is sustained by the view subsequently taken by the court of appeals in Kentucky, in White v. White, A. D. 1859, 2 Metc. (Ky.) 189, where it was decided that an alien who had taken the preparatory oath to become a citizen of the United States, is not thereby rendered capable to take lands by descent; and that his subsequent naturalization does not operate to invest him with the title which in the meantime has vested in the commonwealth. It was supported, also, in the view taken by the federal government at an interesting crisis of American history; as appears by the following letter of the secretary of state to the then British charge at Washington: Department of State, Washington, July 20, 1861. Sir:—Having informally understood from you that British subjects who had merely declared their intention to become citizens of the United States, had expressed apprehensions that they might be drafted into the militia under the late requisition of the war department, I have the honor to acquaint you, for their information, that none but citizens are liable for duty in this country, and that this department has never regarded an alien, who may have merely declared his intention to become a citizen, as entitled to a passport, and consequently have always withheld from persons of that character any such certificate. I have the honor to be, with high consideration, your obedient servant, Wm. H. Seward. To the Hon. Wm. Stewart, etc.