LIBERTY MUTUAL INSURANCE COMPANY *v.* JAMES JOHN CRADDOCK ET AL.

[No. 452, September Term, 1974.]

*Decided May 28, 1975.*

The cause was argued before ORTH, C. J., and MORTON and GILBERT, JJ.

*Sidney G. Leech,* with whom were *Semmes, Bowen & Semmes* on the brief, for appellant, cross-appellee Liberty Mutual Insurance Company.

*E. B. Harris, Jr.,* with whom were *Hardwick, Tripoda & Harris* and *David D. Patton* on the brief, for cross-appellants and appellees, James John Craddock and John Wiley.

*John L. Moring, Jr.,* with whom were *Goff & Moring* on the brief, for appellees Lemasters.

ORTH, C. J., delivered the opinion of the Court.

We are called upon to ascertain whether the Superior Court of Baltimore City erred in its determination of two issues presented to it by a declaratory judgment action. The action arose from an accident which occurred on 5 December 1969 at the intersection of Fayette and Bond Streets in Baltimore City. The facts as adduced at trial by stipulation, testimony and documentary exhibits were not in substantial dispute. Two motor vehicles were involved. One of them was owned by either James John Craddock or John Wiley and driven by either Craddock or Wiley. In any event, both Craddock and Wiley were "uninsured motorists" within the meaning of Maryland law. The other vehicle was a 1963 Volkswagen Karmann Ghia owned by Wilbur Lemasters and Kathryn Lemasters, his wife, and driven by their son, John Jay Lemasters. John's wife, Linda Dale, was a passenger therein. A suit in tort was instituted in the Superior Court of Baltimore City, Docket 1970, folio 227, no. 121991, in which John and Linda claimed damages suffered by the negligence of Craddock and Wiley. Although the record before us does not expressly so show, in the light of the acts of the parties, certain assumptions may be fairly drawn. John and Linda thought that they were the innocent

victims of the negligence of Craddock and Wiley, who were financially irresponsible. They believed that they were qualified persons, under the Unsatisfied Claim and Judgment Fund Law,[1] and that they had suffered injury to their persons and damage to their property under circumstances which entitled them to indemnification from the Unsatisfied Claim and Judgment Fund. Therefore, they gave notice to the Unsatisfied Claim and Judgment Fund Board of their intention to file a claim and supplied the necessary information. We can only conclude that the Board assigned the claim for investigation and defense to an insurer and that insurer selected an attorney to represent Craddock and an attorney to represent Wiley as financially irresponsible tort feasors and to defend the Fund. Code, Art. $66^1/_2$, §§ 150-179 (1967 Repl. Vol.). See *Allied American Co. v. Commissioner*, 219 Md. 607.

The automobile driven by John was a vehicle named in a liability insurance contract issued by Liberty Mutual Insurance Company (Liberty) to Kathryn and Wilbur Lemasters for the period 20 August 1969 to 20 August 1970. John was covered by the contract as a permitted user of the vehicle. The contract included a clause entitled "Protection Against Uninsured Motorists Coverage" which was subject to "Special State Provisions." There was a special provision for Maryland.

---

1. Ch. 836, Laws of 1957, effective June 1, 1957, created the "Unsatisfied Claim and Judgment Fund" in Maryland. First codified in the 1957 Cumulative Supplement to the 1951 Code as Art. $66^1/_2$, §§ 145A-145DD, the Law was patterned after earlier New Jersey legislation and was designed primarily to protect Maryland citizens, particularly those who would be least able to bear the loss or injury inflicted by irresponsible or unidentified motorists. Maddy v. Jones, 230 Md. 172. See Unsat. C. & J. Fund v. Hamilton, 256 Md. 56. In the 1957 Code, the Law was renumbered as § 150 to § 179. When ch. 534, Laws of 1970, effective January 1, 1971, repealed, renumbered and re-enacted Article $66^1/_2$, the Law was codified as §§ 7-601 to 7-635. Ch. 73, Laws of 1972, effective January 1, 1973, repealed §§ 7-601 to 7-635 and enacted Art. 48A, §§ 243-243L which created the "Maryland Automobile Insurance Fund" (MAIF). All the assets of the UCJ Fund were transferred to MAIF, § 243A (a). Section 243G (a) provides for claims against the UCJ Fund which arose prior to 1 January 1973. See Diamond v. Unsat. C. & J. Fund Bd., 268 Md. 260, 261, note 1. Only a "qualified person" or his personal representative can make application for payment from the UCJ Fund. Code, Art. $66^1/_2$, § 158 (1967 Repl. Vol.); Art. $66^1/_2$, § 7-611 (1970 Repl. Vol.). See Art. 48A, § 243G (a) (1974 Cum. Supp.)

On 3 October 1972 Craddock and Wiley filed a petition in the Superior Court of Baltimore City for declaratory judgment, naming as defendants, Wilbur Lemasters, John Jay Lemasters, Linda Dale Lemasters, the Unsatisfied Claim and Judgment Fund Board, and Liberty Mutual Insurance Company. It sought, and was granted by order of 3 October 1972, a stay of the tort suit until the declaratory judgment action was heard and determined. Ultimately two issues were presented by the declaratory action:

I "Are John and Linda 'qualified persons' entitled to seek compensation under the Unsatisfied Claim and Judgment Fund Law?"

II "Does the 'uninsured motorist' clause of the policy issued by Liberty Mutual Insurance Company on the automobile operated by John on December 5, 1969 extend coverage to John and Linda?"

The declaratory judgment action was heard without a jury on 9 April 1974. The Court issued an order on 23 May which included a memorandum opinion. It answered both issues in the affirmative, that is that John and Linda were "qualified persons" entitled to compensation under the Unsatisfied Claim and Judgment Fund Law and that the uninsured motorist clause of the Liberty policy was applicable to them. On 29 May 1974 judgment absolute was entered against Liberty for costs. Liberty appealed, claiming that the trial court erred in its ruling on issue II. Craddock and Wiley also appealed, claiming that the court erred in its ruling on issue I.

I

" 'Qualified person' means a resident of this State or the owner of a motor vehicle registered in this State or a resident of another state, territory or federal district of the United States or province of the Dominion of Canada, or foreign country, in which recourse is afforded to residents of this State, of substantially similar character to that

provided for by this subtitle. . . ." Code, Art. 66¹/₂, § 150 (g) (1967 Repl. Vol.); Art. 66¹/₂, § 7-602 (g) (1970 Repl. Vol.); Art. 48A, § 243L (e) (1974 Cum. Supp.).

It is agreed that under the factual posture of this case John and Linda are "qualified persons" only if they were residents of Maryland at the time of the accident. "Resident" within the contemplation of the Unsatisfied Claim and Judgment Fund Law is the equivalent of "domiciliary". *Maddy v. Jones,* 230 Md. 172, 179. Thus, issue I is to be resolved upon a determination whether John and Linda were domiciled in Maryland on 5 December 1969. In the recent opinion of *Bainum v. Kalen,* 272 Md. 490, 497, the Court of Appeals discussed the meaning of domicile and how domiciliary status is determined:

> "A person may have several places of abode or dwelling but '[h]e can have only one domicile at a time.' *Shenton v. Abbott,* [178 Md. 526] at 530. A person's domicile has been defined as the place 'with which he has a settled connection for legal purposes' and the 'place where a man has his true, fixed, permanent home, habitation and principal establishment, without any present intention of removing therefrom, and to which place he has, whenever he is absent, the intention of returning.' *Shenton v. Abbott, supra,* 178 Md. at 530. The controlling factor in determining a person's domicile is his intent. One's domicile, generally, is that place where he intends it to be. *Harrison v. Harrison* [117 Md. 607] at 614. *Wagner v. Scurlock* [166 Md. 284] at 292; *Gallagher v. Bd. of Elections,* [219 Md. 192] at 198. However, the determination of intent is not dependent upon what one says at a particular time. As this Court has stated, intent regarding domicile 'may be more satisfactorily shown by what is done than by what is said.' *Wagner v. Scurlock, supra,* 166 Md. at 292; *Harrison v. Harrison, supra,* 117 Md. at 614."

In *Shenton* the Court further clarified the concept of intention: "Of course, if a person has actually moved to a new abode, with the intention of remaining there for an indefinite time, and establishing it as a place of fixed present domicile, that place is deemed to be his domicile, notwithstanding he may entertain a floating intention to return to his former domicile at some future time." 178 Md. at 532-533. In earlier cases, the Court recognized that domicile could be established by showing that a person moved to a new home with a present intention of remaining there indefinitely or for an unlimited time. *Shaeffer v. Gilbert*, 73 Md. 66, 70 ("the place where one intends to reside permanently or for an indefinite or unlimited period of time. . . ."); *Brafman v. Brafman*, 144 Md. 413, 414 ("a residence at a particular place accompanied by positive or presumptive proof of the intention to remain there for an unlimited time. . . ."). For recent reiterations of this concept see *Smith v. Smith*, 254 Md. 31, 35 and *Bainum, supra,* at 498. A person retains a domicile once established until he acquires a new one. *Hall, Adm. v. Morris*, 213 Md. 396, 404. The first domicile a legitimate child acquires is a "domicile of origin" which is the domicile of the father at the time of the child's birth. 1 J. Beale, *Conflict of Laws* § 14.1 (1935); Restatement (Second) of Conflicts § 14 (1971). During minority, or until the minor becomes emancipated, the child's domicile ordinarily remains that of his father. *Sudler v. Sudler*, 121 Md. 46, 50; Beale, *supra,* § 30.1; Restatement, *supra,* § 22. Once a person attains majority or is emancipated, he may establish a new domicile separate from his parents. Restatement, *supra,* § 22, comment f. This new domicile, or any domicile subsequently acquired, is classified as a "domicile of choice." Beale, *supra,* § 15.2. As the legal domicile of a wife is that of her husband, *Rumbel v. Schueler*, 236 Md. 25, 27,[2] the question is where was John domiciled on the date of the accident.

---

2. We do not reach the effect on this common law rule of the passage of the Equal Rights Amendment, Article 46 of the Declaration of Rights, ratified Nov. 7, 1972. In the circumstances of this case, where the issue was not raised, Linda accompanied her husband to Maryland in 1969 and lived with him there. See Restatement, *supra,* § 21.

As we have indicated, "It is a fundamental rule that, in order to effect a change of domicile, there must be an actual removal to another habitation, coupled with an intention of remaining there permanently or at least for an unlimited time." *Shenton, supra*, at 530. Therefore, assuming that an individual has the capacity to do so,[2a] there are two requisites for a valid change of domicile, namely, an act and an intent. Harrison, supra, at 613. As shall be seen, the first requisite was satisfied by John and Linda actually moving to Baltimore. "The only question for consideration, therefore, is as to the intent of the parties." *Id.* The determination of intention with regard to the acquisition of a domicile of choice is a question of fact, Beale, *supra*, § 15.1, *Gallagher, supra*, at 198, depending upon the circumstances of each case. *Shenton, supra*, at 533. Because the intention here is a question of fact, and because the trier of fact in the instant case was the trial judge, the "clearly erroneous" rule applies. Maryland Rule 1086.

Evidence adduced showed that John's domicile of origin was Ohio. In 1965, however, his family established a permanent home in Pennsylvania. John entered Yale that year. He was 18 years of age. It appears that he went to New Haven only for educational purposes and considered Pennsylvania his home. He returned home for summer vacation after his first and second years of college, but at the end of his third year remained at Yale because he was employed there. He returned home for Easter and Christmas vacations. See Restatement, *supra*, § 18, comment f, example 13. A room was maintained for him in his parents' home. His domicile remained that of his father. Beale, *supra*, § 22.8; 25 Am.Jur.2d, *Domicil* § 43; *Bainum, supra*, at 500. When John was graduated from Yale in 1969 significant changes took place. He was married to Linda and moved to Baltimore to enter the Johns Hopkins University School of Medicine. The question is

---

**2a.** Restatement, *supra*, § 15, lists three requirements for establishing a domicile of choice. Besides the requisite intention, § 18, and physical presence, § 16, the person must have the legal capacity to change his domicile. John was sui juris when he moved to Baltimore.

whether he abandoned his parents' home and acquired a new domicile of choice in Maryland.

John was 26 years of age at the time of the trial on 10 October 1973. He then lived at 6509 Copper Ridge Road, Apartment 22, Baltimore, Maryland. He was to receive a medical degree in June 1974. He and Linda drove to Baltimore on 9 September 1969. His statement of what he intended at that time was clear. They were going to set up housekeeping in Baltimore as a married couple and remain indefinitely. "[I]t was my intent and my wife's intent that we were going to Maryland and we were going to set up a household there, and we were going to live there twelve months a year . . . indefinitely." His intention was iterated on further examination.[3]

> "My intention was to come here and live, as I said, an indefinite period of time. My intention was to come here and set up a household to live with my wife as my family, to live here in Maryland. And I was to live here twelve months out of the year, and it would have been essentially indefinitely."

It was reiterated in answer to a question about the medical school:

> "My intention was to go through the program, a medical degree at Johns Hopkins, and also to live in Baltimore twelve months a year."

At that point he did not know whether he would eventually practice medicine in Maryland or Pennsylvania "or Chicago or anyplace. . . ." John's intention in moving to Baltimore was corroborated in detail by Linda during the extensive examination of her. She said her personal intention was to make her home with her husband. The move "was quite

---

**3.** Representation of the parties was as follows: Craddock by E. B. Harris, Jr., Esquire; Wiley by David D. Patton, Esquire; Wilbur Lemasters and John and Linda Lemasters by John Moring, Esquire; Liberty Mutual Insurance Company by Sidney G. Leech, Esquire. John was called and examined as an adverse witness by Harris. He was cross examined by Patton, Moring and Leech. Harris questioned him further on redirect examination and on rebuttal. There was recross examination by Patton and Moring.

permanent as far as we knew it." She declared categorically in reply to a question whether she and her husband had an intention to return to Pennsylvania: "We had none whatsoever. None of us had any intention of returning to live there." Asked later by the court why she was so positive about there being no intention to go back to Pennsylvania, she explained: "Certainly not to the vicinity of our parents. There was nothing for us: no major hospital in that area. We had no intention of going back." The court persisted: "To live in the house with your parents?" She answered: "Or live in Pennsylvania. There was never any discussion of that with either of us." John spoke of the understanding of his parents with respect to the permanency of his move. It was understood "[t]hat I was out of the house. That I was living in Maryland, I mean, I was out of the house, if you would like that expression. I was no longer living at home, for all intents and purposes; when I came home I visited my parents at their home, and I would, you know, sleep in the guest bedroom with my wife."

The intention as expressed by John and Linda was substantiated by their actions. When they moved to Baltimore they stopped by the home of John's parents to pick up his belongings.[4] "I sort of cleaned out my bedroom at home and took the dresser and the chair and the desk, and some pictures off the wall, and my room became my sister's room . . . [I]t was repainted and set up for my younger sister who had not had her own prior to this. She was in high school, and this permitted her to have her own room, and she was quite pleased." Linda said of John's former room: "That is now his sister's room. The wallpaper, drapes have been changed, and everything. It is a girl's room now. John no longer has the room now."

When John and Linda moved to Baltimore in 1969 they lived in an apartment at 550 N. Broadway, executing a lease running for 10 months from 1 September 1969. At the expiration of that lease they executed another lease for 12

4. The furniture was transported to Baltimore in a rented truck which John drove. Linda drove the Volkswagen.

months for a different apartment in the same apartment house. The following year they moved to 4400 Mannasota Manor and ultimately to 6509 Copper Ridge Drive. Shortly after they moved to Baltimore they opened a checking account at the Maryland National Bank. A bank statement as of 13 November 1969 showed their address to be 550 N. Broadway. A bill for delivery of the Sunpapers for the period September to October 1969 bore the same address, as did a residence telephone bill dated 5 October 1969. A United States income tax return for the year 1969 was filed by them in April 1970 designating 550 N. Broadway as their address. Maryland income tax returns were filed in 1971, 1972 and 1973. The returns were filed under the address in Maryland at which they were then living.[5] They registered to vote in Maryland in the election of November 1970. He indicated that he had not registered to vote in any state prior to that. Voting registration records of the Board of Election Supervisors of Baltimore City pertaining to John and Linda were received in evidence. They showed that each registered to vote on 5 October 1970. Their address was 550 N. Broadway.

The judge below made the following factual determinations:

"A review of the evidence reveals certain facts: John and Linda set up a home as husband and wife for the first time in Baltimore; they opened a bank account in Baltimore, paid taxes in Maryland, were extended credit in Baltimore, and registered to vote in Maryland (subsequent to December)."

He elaborated on his finding of requisite intention in order to satisfy the demands of the Court of Appeals that "in order to establish a change of domicile, it must be shown not only that a new residence was acquired with the intention of remaining there, but also an abandonment of the old

---

5. With regard to the 1970 Maryland return John indicated that he considered the amount withheld to cover his tax liability without filing a return. He explained why he did not file a return: "I think because it only involved a couple of dollars, and just a matter of figuring."

domicile so permanent as to exclude the existence of an intention to return to the former place." *Shenton, supra,* at 534. The trial judge explained:

> "Facts which indicate an intention not to return are their declarations that they had so abandoned Pennsylvania domiciliary status, the removal of all of John's possessions from his parents' home and the transportation of same to Baltimore via rented vehicle, the fact that John's mother remodeled his room for John's sister following his departure, and the statement by John and his mother that John and Linda are guests upon their return visits to his parents' home. The Court finds, therefore, that there is sufficient evidence in the record to conclude that John and Linda did in fact possess both the intent to remain in Baltimore *(animus manendi)* and the permanent intention to abandon their old domicile *(animus non revertendi)* if, indeed, they ever had any domicile in Pennsylvania as man and wife."

We must determine whether the judge below was clearly wrong when he found that "[t]hese facts clearly demonstrate an *intent to establish Baltimore as their new domicile.*" In making this determination we view the evidence in a light most favorable to John and Linda as the prevailing parties below. If there is substantial evidence to support the factual conclusions reached by the trial court, its judgments on the evidence were not clearly erroneous and we must accept them. *Burroughs Int'l. Co. v. Datronics,* 254 Md. 327, 337-338.

Craddock and Wiley do not dispute the lower court's factual findings as to *"animus non revertendi."* Indeed, in the light of John's marriage and the removal of his possessions from his parents' home, there was ample evidence to justify a finding of intent to abandon the Pennsylvania domicile. They urge, however, that the lower court erred in finding that John and Linda were domiciled in Maryland, contending that "the trial court's finding of intention is

based on unsupported findings of fact and on irrelevant and immaterial facts." They assert that John and Linda first lived as husband and wife in Connecticut. Although this is true, their residence in that state was obviously a temporary one, as John planned to study medicine in Baltimore. There is legally sufficient evidence to support the trial judge's finding that John and Linda set up their first *home* as husband and wife in Baltimore.[6] Craddock and Wiley argue that the only evidence of credit in the record is the apartment lease, the gas and electric, telephone and newspaper bills, and certain educational loans made by John. They contend that even if such items can be considered as credit in the broad sense, they ought not to be considered as relevant to the issue of intention to establish a permanent residence, because they are incidents of both permanent and temporary residence. We think that all the items mentioned have rational probative value. *Haile v. Dinnis*, 184 Md. 144, 152. The weight given to such evidence is for the trier of fact.

Craddock and Wiley emphasize that John and Linda opened a checking account and not a bank account. We believe that the deposit of funds in a Maryland bank whether it be for savings or checking purposes, is relevant and competent evidence on the question of intention to establish a domicile in this state.

We believe that the registering of John and Linda to vote in Maryland has probative value. In *Bainum, supra*, at 498, the Court of Appeals noted:

> "[T]he two most important elements in determining domicile are where a person actually lives and where he votes. In *Harrison v. Harrison, supra*, 117 Md. at 615, our predecessors stated: 'The presumption of the law is that where a person actually lives is his domicile, though this is a rebuttable presumption.' As to the place of voting, this Court has termed it the 'highest evidence of

6. The Court of Appeals pointed out in Shaeffer v. Gilbert, 73 Md. 66, 70, that there is a difference between a "fixed and settled abode or actual home" (domicile in the popular sense) and a "residence for a temporary purpose."

domicile,' *Wagner v. Scurlock, supra,* 166 Md. at 292."

Craddock and Wiley argue that any evidence that John and Linda registered "subsequent to December" is irrelevant and immaterial as to the issue of intention as of the date of the accident. They declare that post-accident acts are irrelevant and immaterial on the issue of domicile. The Court of Appeals, both in *Maddy, supra,* at 180-181, and *Walsh, Adm'r. v. Crouse,* 232 Md. 386, considered post accident acts in upholding the findings of the lower court. Even though such evidence sheds only "slight illumination" on the state of John and Linda's intention on the date of the accident, *Hawks v. Gottschall,* 241 Md. 147, 152, and even though registering to vote after the accident is not conclusive evidence of domicile, see *Gallagher, supra,* at 199, we note that John registered for the first election held after his move to Baltimore (November of 1970), and that he "actually" lived in Baltimore on the date of the accident.

With reference to the payment of income taxes, Craddock and Wiley point out that the only State income taxes for 1969 paid by John and Linda were the amounts withheld from their earnings and that such amounts would be withheld from any person working in the State regardless of domicile. Code, Art. 81, § 312 (1969 Repl. Vol.). They emphasize that no return was filed for 1969. See n. 5, *supra.* Maryland law required all persons domiciled in this state on the last day of the taxable year to file a state return. Art. 81, § 294 (a) and § 279 (i) (1969 Repl. Vol.). *See Evans v. Comptroller,* 273 Md. 172. We note that if John had considered himself a temporary resident because he lived in the state for only four months during 1969, he could have filed a return and demanded a refund of the amount withheld. Section 288 (a) of Art. 81 would impose a state income tax on John for 1969 if he were a "resident". Section 279 (i) defines resident as one who was domiciled in this state on the last day of the taxable year or who maintained a place of abode within this state for more than six months. See *Wood v. Tawes,* 181 Md. 155, 160.

As we have indicated, Craddock and Wiley do not

challenge the trial court's finding that John abandoned his family residence in Pennsylvania.[7] They argue, however, that John moved to Maryland solely for the purpose of his education. A similar contention was before the Court of Appeals in *Bainum*. Bainum argued that he was still domiciled in Maryland because his two year absence to pursue a course of study elsewhere should be viewed as temporary and not sufficient to establish a change of domicile. The Court, at 500, quoted earlier language from *Shaeffer, supra,* at 72:

> "We agree that mere residence at the college for the purpose of pursuing his studies would not, *in itself,* be sufficient to prove that he meant to abandon his original residence, or to prove that he meant to make his actual home . . . [elsewhere]. *In the absence of other proof,* the law would presume, he was there for the purpose of prosecuting his studies, and this purpose being accomplished, he intended to return to his former residence." (emphasis added)

The Court, however, found that "Bainum did much more than temporarily live in Michigan while pursuing his studies there." *Id.* at 501. Noting that Bainum registered to vote in Michigan, obtained a Michigan driver's license and registered his auto there, and considered Michigan his tax domicile, the Court found that he had established a domicile while studying there:

> "While a student does not effect a change in domicile merely by living away from home while pursuing his studies, nevertheless a student may abandon his former domicile and establish a new domicile where he attends school. When a student engages in conduct such as Stewart Bainum did

---

**7.** In Maddy, Walsh, Rumbel, and Hawks, all *supra,* which involved eligibility under the UCJ Fund law, the Court held that domiciliary status was not established. A telling factor in all was the inability of the claimant to show that he had abandoned his former domicile.

here, he will be deemed to have abandoned one domicile and established another." *Id.*[8]

Here, there was more than "mere residence" in Baltimore for the purpose of attending medical school. There are John's abandonment of his Pennsylvania domicile and his declarations and conduct which tend to show an intention to establish a domicile in Maryland.[9] Although John was in Baltimore for only three months before the accident, his actions indicated a domiciliary intent. As the Court of Appeals emphasized in *Harrison, supra,* at 616: "No certain or definite duration of residence is requisite under the law to accomplish the acquisition of a new domicile. What is required, and all that is required, is that there shall be a clear definite intent and an act done in execution of that intent." The change of residence was the necessary act, and there was evidence tending to show the intent.

In the legal scheme everyone must have a domicile. Beale, *supra,* § 11.1. As John abandoned his domicile in Pennsylvania, where was his domicile other than Maryland? The short of it is that viewing the evidence, as we must, in the light most favorable to John and Linda, there was evidence to support the factual findings of the trial court. Those factual findings provided evidence sufficient in law to support the judgment of the lower court that John and

---

**8.** For an excellent discussion of the factors to consider when determining the domiciliary status of a student for voting purposes, see Hall v. Wake County Board of Elections, 280 N. C. 600, 187 S.E.2d 52 (1972). *See also,* Annot., 98 A.L.R.2d 488, Annot., 44 A.L.R.3d 797. We note that both annotations state the majority rule that where a student considers the school community his home for the present and entertains no intention of returning to his former home, he is afforded the privilege to vote.

**9.** The Restatement, *supra,* notes that one of the factors to consider when determining domiciliary intention is the motives which led the person to change residence, § 18, comment f. Under the heading "To attend educational institutions", the following example is given as no. 14:

"A, a young man just graduated from college, definitely leaves his former home, marries and goes with his wife to State X where he enters a professional school. He takes a house there, intending to live there until he secures his professional degree. These facts tend to show that A intends to make his home in X and has acquired a domicil of choice there."

See Beale, *supra,* § 22.8.

Linda were domiciled in Maryland on 5 December 1969.[10] Therefore, its judgment on the evidence was not clearly erroneous, and we may not set it aside. Rule 1086.

## II

It appears that a Liberty automobile insurance policy consists of a printed basic contract setting out uniform provisions, terms and conditions. To this is appended from time to time documents tying the basic contract to an individual insured and named vehicles. The basic contract here issued contained a clause providing "Protection Against Uninsured Motorists Coverage":

> "The company will pay all sums which the insured or his legal representative shall be legally entitled to recover as damages from the owner or operator of an uninsured highway vehicle because of bodily injury sustained by the insured, caused by accident and arising out of the ownership, maintenance or use of such uninsured highway vehicle: provided, for the purpose of this coverage, determination as to whether the insured or such representative is legally entitled to recover such damages, and if so, the amount thereof, shall be made by agreement between the insured or such representative and the company or, if they fail to agree, by arbitration."

Although the coverage was generally in force across the

---

10. In Bainum, *supra*, at 499, the Court listed additional factors to consider, besides particular place of abode and place of voting:

> "These include such things as: the paying of taxes and statements on tax returns; the ownership of property; where the person's children attend school; the address at which one receives mail; statements as to residency contained in contracts or other documents; statements on licenses or governmental documents; where furniture and other personal belongings are kept; which jurisdiction's banks are utilized; membership in professional, fraternal, religious or social organizations; where one's regular physicians and dentists are located; where one maintains charge accounts; and any other facts revealing contact with one or the other jurisdiction. *See* Gallagher v. Bd. of Elections, *supra*, 219 Md. at 196-198."

entire United States,[11] there were "Special State Provisions", introduced by a clause reading:

> "It is agreed that if this policy insures an owned automobile principally garaged in a state named below, such insurance as would otherwise be afforded by the policy with respect to (a) any automobile principally garaged in said state, and (b) any accident, occurrence or loss within said state shall be subject to the special provisions hereinafter specified for said state."

There was a special provision specified for Maryland:

> "Such insurance as is afforded by the policy under the Uninsured Motorist Coverage does not apply to an accident occurring in the State of Maryland."

It is clear that coverage under the uninsured motorist clause is excluded with regard to an automobile principally garaged in Maryland involved in an accident in Maryland. Therefore, resolution of the second issue turns on whether, in the contemplation of the policy, the automobile driven by John was principally garaged in Maryland on 5 December 1969, the date of the accident.

Liberty first issued an automobile policy to the Lemasters in 1957. It was cancelled and rewritten in 1965 when the Lemasters moved to Valley Forge, Pennsylvania. Wilbur completed an application form as of 20 August 1965 in his name and that of his wife, Kathryn. The named automobiles were a 1964 Ford and a 1965 Mustang and licensed operators named were Wilbur and Kathryn, their daughter, Jeanne, and son, John. It seems that a "declaration sheet" is appended to the basic printed contract each year, apparently from information requested of the insured. In the words of Leslie Isernhage, an underwriter for Liberty, it "forms the back part of the policy itself", and states the names of the insured and itemizes the vehicles insured and coverage

---

11. Policy coverage was effective "within the United States of America, its territories, or possessions, or Canada. . . ."

provided. The declaration sheet for the term beginning 20 August 1969 was offered in evidence. The insured were Kathryn and Wilbur. Their address was stated to be 2051 Welsh Valley Road, Box 454, Valley Forge, Pa. 19481. Three automobiles were specified, including the Volkswagen. Also appended to the policy and a part thereof was an "itemized change endorsement" effective 29 May 1968. The endorsement listed the 1964 Ford, the 1965 Mustang and the 1963 Volkswagen as the owned automobiles. It showed the liability and physical damage coverage as to each vehicle and indicated a premium adjustment with respect to the Volkswagen — a $10 credit applying until the next anniversary payment was due. The endorsement expressly provided that, as of its effective date, 29 May 1968, "the insurance provided by the policy and the limits of liability applicable thereto are as indicated herein, subject to all of the terms of the policy having reference thereto." It declared:

> "The owned automobile will be principally garaged in the town and state of the named insured's address, unless otherwise stated herein:"

The town and state of the named insured's address was shown to be Valley Forge, Pennsylvania. This itemized change endorsement remained a part of the policy for the period 20 August 1969 to 20 August 1970.

Although the policy clearly provided that with regard to an owned automobile principally garaged in Maryland, there was no uninsured motorist coverage as to an accident occurring in Maryland, the policy itself, through the itemized change endorsement in effect at the time of the accident, declared that the vehicle was principally garaged in Pennsylvania, it not being otherwise stated in the endorsement.[12] In the absence of misrepresentation on the

---

12. A "Classification and Coverage Sheet" completed by Liberty five days after the accident in response to a "medical payment claim" by Linda for $290 showed the automobile as "Garaged at Valley Forge, Pa." An accident report, dated 18 December 1969 and signed by Wilbur, which from the handwriting was apparently filled in by two different persons, stated the automobile was "Garaged at Baltimore, Md."

part of the insured, and none is here alleged or shown, we think that the statement in the policy is conclusive of where the vehicle was principally garaged. We so conclude because the statement in the endorsement was not a promissory warranty the breach of which voided coverage. Rather, it was merely an expression of intention or expectation. We observe that the policy contained no language imposing a duty on the insured to notify the insurer of a change of residence much less a change of where a named owned vehicle is from time to time garaged. Nor was there any explicit undertaking or agreement on the part of the insured that the car would be kept principally at the Pennsylvania address. We find *Universal Underwriters v. Gran,* 114 N.E.2d 501 (Ohio 1952) to be persuasive. In that case, the policy contained the statement that the automobile would be principally garaged in Minneapolis, Minnesota. After the policy had been in effect for less than a month, the insured moved to Ohio. Two months later he was involved in an accident in that state. The insurer argued that the garaging statement amounted to a promissory warranty which had been breached by the insured. The Ohio court rejected this contention:

> "There are a number of other reasons for construing the place at which the car would be garaged as merely an expression of expectation. It is a well-known fact that an automobile is extremely movable and, likewise, people oft-times change their residence during the term of a policy, particularly those in certain lines of business.
>
> These facts being well known to the insurance company, surely places the duty upon it as the draftor of the instrument if it so desired to state that it desired to be notified of any change of residence or removal of the car to a new home. In other words, if it was the desire and intention of the insuring company to consider the place at which the car is kept as a warranty, it would be its duty to expressly say so, and its failure to do so is a very strong indication that the place where the car was

garaged was not intended to be a warranty, the violation of which would forfeit the policy. . . .

The policy itself, contains many conditions, limitations and agreements but there is no where any reference to an exclusion as to where the automobile was to be used in the United States nor is there any explicit undertaking or any agreement on the part of the assured that he would keep the car principally at the address in Minneapolis.

Therefore, the statement as to the place where the automobile would be principally garaged must be fairly and justly construed as a statement of expectation only. There is no explicit provision of forfeiture and at least the intent of the parties to this contract, as reflected by the language of the policy with regard to this provision, is most certainly not clear enough to exclude the conclusion that it was merely the expression or intention on the part of the policy holder, and that it was not intended that the policy should be void by virtue of a change of residence and use of the car elsewhere." *Id.* at 503.

To like effect was *Sutton v. Hawkeye Casualty Co.*, 138 F. 2d 781 (6th cir. 1943). In that case, the policy, under the heading "Warranties", provided that the automobile would be principally garaged and used in Kalamazoo, Michigan with "No exceptions". Approximately six months after the beginning of the policy period, the insured moved to Tennessee. Four months later he was involved in an accident. The question presented on appeal was whether the statement as to where the auto would be principally used was merely an expression of intention or expectation or whether it was a warranty. Liberally construing the policy in favor of the insured, the federal court interpreted the statement as one representing the intention of the insured:

"The indefinite phrasing of the statement relied upon as a condition of the contract, when considered in connection with the broad coverage of

the policy, its susceptibility of different interpretations, and the requirement that the language be construed to effect the insurance unless it is so clear as to preclude any other construction, likewise commands a construction in favor of the assured against forfeiture." *Id.*, at 786.

The Court of Appeals of this State had indicated that absent a duty of notification a garaging statement operates only as an expression of intention. In *Grain Dealers v. Van Buskirk*, 241 Md. 58, the policy provided uninsured motorist coverage almost identical to the coverage provided by Liberty. The policy contained a declaration that the automobile would be principally garaged in Ferrum, Virginia. Eight months after the policy period began the insured moved to Maryland. Three months later he was killed in an accident. When his wife attempted to collect under the uninsured motorist provision, the insurer argued that there could be no recovery because the insured had failed to notify the insurer that he had moved to Maryland. The Court rejected the argument that the garaging statement placed a duty of notification on the insured, the breach of which eliminated coverage. With regard to the operative effect of the garaging statement the Court said, at 71:

"When the policy was issued it was intended that the automobile would be principally garaged in Ferrum and it was. There was, however, no provision in the policy forbidding the named insured from moving the automobile to another location or requiring the named insured to give the company notice of such a change."

It is true that the circumstances in *Universal, Sutton,* and *Grain Dealers,* all *supra,* are not identical to those in the instant case. In those decisions, an express garaging statement was apparently printed in the policy itself which the insurers contended constituted a promissory warranty breached by the insureds. In the Liberty policy the "principally garaged" language was not inserted to operate

as an expression of intended residence but as a method of determining when special territorial limitations come into effect. We think, however, that the rationale of *Universal, Sutton,* and *Grain Dealers* with regard to operative effect of garaging language is applicable to a determination as to when the terms in the "Special State Provisions" in the policy before us become effective. The common thread which is found in *Universal, Sutton,* and *Grain Dealers* is the absence of any provision in the contract placing a duty on the insured to notify the insurer of a residence change. Since the insured is under no such obligation when moving from one place to another, and since the policy by its own terms applies throughout the United States, his reasonable expectation is that he will receive the same coverage in his new location as he received in his old location. As the federal court noted in *Sutton, supra,* at 785, "[t]here is no mention in the policy of any provisions relating to notice of address of the assured, change of residence, or removal of the automobile outside the state, which are often found in similar policies — all of which is suggestive that such eventualities would have *no effect* upon the protection extended by the policy." (emphasis added). At best the term "principally garaged", its operative date, and any requirement of notice, are ambiguous.[13] This is especially so in view of the broad geographical coverage afforded under the policy. It is a well established rule that the provisions of insurance policies, prepared as they are by the insurance companies, are, in the case of ambiguities, to be construed strictly against the company preparing the policy and in favor of the insured. *Grain Dealers v. Van Buskirk, supra,* at 71; *Haynes v. Am. Cas. Co.,* 228 Md. 394, 400. Even if the policy here be considered as ambiguous regarding "principally garaged", ambiguity would be resolved against the company and in favor of the insured.

In contending that the Volkswagen was principally garaged in Maryland on the date of the accident, Liberty argues that any determination with respect to garaging

---

13. Sutton, *supra,* at 785 emphasized that "principally" is a "vague, indefinite, uncertain term."

must be based on the facts as of that date. Applying what it refers to as "a reasonable man" standard, it asserts that the automobile was principally garaged in Maryland for over 75% of the time period between the date of the loss and the inception of the policy period.[14] Conceding that the policy "did not attempt to exact from the insureds a promise that the insureds' vehicle would be 'principally garaged' at any given location at any given time," Liberty argues that the language "is more analogous to an exclusion". When a vehicle which was originally garaged at one location is moved to another state and becomes in fact principally garaged there, any special provision referring to that state would automatically come into effect. Therefore, when the Volkswagen became principally garaged in Maryland, which by Liberty's calculations would be the middle of September 1969, the policy exclusion automatically went into effect.

The Lemasters and Craddock and Wiley contend that the car was not principally garaged in Maryland on the date of the accident. They argue that the terms "principally garaged" must be interpreted according to the existing facts at the time the contract of insurance was rewritten in 1965 to reflect the change of residence by Wilbur and Kathryn. The garaging statement made at that time was merely an expression of intention or expectation which remained operative up to and including the time of the accident. Since there was no duty on the Lemasters to inform Liberty when a change in location was made, the original statement remained effective so long as no change was made in the policy at renewal time based on information supplied by the insureds or at some time during the policy period when

---

14. Liberty relies on Sutton as a source for its "reasonable man" standard. This method of calculation, however, was used by the court in that opinion only to show that even if the policy statement be construed as a promissory warranty, it was not breached since the automobile was used in Michigan for six months and in Tennessee for only four. The court still found that the statement was one of expectation only. State Farm v. Porter, 186 F. 2d 834 (9th cir. 1951), also cited by Liberty, simply held that an automobile was not principally garaged at a new location. Although the court found that the automobile had been kept in the original location for 53 days and at a subsequent location for only 15 days, it, citing Sutton, was "by no means certain that this language of the policy was a warranty." *Id.* at 844.

knowledge of a change came into Liberty's hands. Therefore, even though John and Linda brought the car to Maryland and kept it here for the majority of the applicable policy period prior to the accident, it remained "principally garaged" in Pennsylvania for purposes of construing policy coverage under the uninsured motorist provision. The trial court found that the policy language "must be construed to mean where the car was principally garaged when the contract of insurance was originally written." Emphasizing that the policy afforded coverage throughout this country, the court found that to "adopt the restrictive interpretation suggested by the defendant, Liberty Mutual would destroy the intent and reasonable expectations" of the insured because he would be placed "in the untenable position of having uncertain and unpredictable insurance coverage as he travels from state to state if he decides to spend any length of time in a state other than where the car was garaged when the policy was written." Therefore, the court held that the car was "principally garaged" in Pennsylvania on the date of the accident and that John and Linda were covered by the uninsured motorist provision.

We reach the same conclusion as did the trial judge, but by a little different route. We believe that when an insurance contract does not require an insured to notify the insurer of a residence change or of a change in the principal place of garaging a named owned automobile during a given policy period, the address set out in the policy governs in the absence of misrepresentation.[15] Here, as the Volkswagen was not principally garaged in Maryland at the beginning of the applicable policy term, the special Maryland provision did not apply. Therefore, the uninsured motorist protection clause was in force and covered John and Linda on 5 December 1969. The trial court did not err in so ruling.

> *Judgment affirmed; costs to be paid one-half by Liberty Mutual Insurance Company and one-half by James John Craddock and John Wiley.*

---

15. For the purposes of issues raised on this appeal, we need not reach

the question of whether the Volkswagen was "principally garaged" in Pennsylvania or Connecticut. Liberty raised the issue of misrepresentation at the lower court but not on appeal.