## JOANN HOLLY ET AL. *v.* MARYLAND AUTOMOBILE INSURANCE FUND ET AL.

[No. 299, September Term, 1975.]

*Decided December 31, 1975.*

The cause was argued before MOYLAN, MENCHINE and MOORE, JJ.

*Walter I. Seif, Jr.,* with whom were *Edward S. Feldman, D. Duffy Herman* and *Harry A. E. Taylor* on the brief, for appellants.

*Theodore B. Oshrine,* with whom were *Allen, Thieblot & Alexander, John J. Corbley* and *J. Edward Martin, Jr.,* on the brief, for appellees.

MENCHINE, J., delivered the opinion of the Court.

Joann Holly (Holly) and Mary Ann Josiah (Josiah) sustained injuries in an accident on October 31, 1971 while passengers in an automobile operated by an uninsured motorist. After obtaining judgments against the motorist for $2500.00 and $15,000.00 respectively, Holly and Josiah petitioned for payment thereof under the Unsatisfied Claim and Judgment Fund Law. (Article 66½, § 7-601 through § 7-635 of the Annotated Code of Maryland, 1970 Replacement Volume).[1] In separate answers to the petitions, the Maryland Automobile Insurance Fund (Fund) denied responsibility for payment of the judgments upon the ground that the judgment creditors were not residents of the State of Maryland on the date of the accident within the meaning of the statute governing their claims.

The trial court, after hearing, concluded that neither Holly nor Josiah were "qualified persons" within the meaning of former Article 66½, § 7-602 and thus not entitled to receive payment of the judgment from the Fund.

Initially enacted as Article 66½, § 145A by Ch. 836 of the Acts of 1957, the section underwent codification identity changes to § 150 (Annotated Code of Maryland, 1957) and to § 7-602 (Annotated Code of Maryland, 1970 Replacement Volume) but without change in the definition of the term "Qualified Person." [2] That constant definition reads as follows:

"(g) *'Qualified person'* means a resident of this

---

1. The Unsatisfied Claim and Judgment Fund Law was repealed by Ch. 73 § 2 of the Acts of 1972, effective January 1, 1973. Under § 1 of that Chapter, however, claims against the Unsatisfied Claim and Judgment Fund existing as of December 31, 1972 were transferred to and deemed to be claims against the Maryland Automobile Insurance Fund as therein created. (Codified as Article 48A, § 243G.)

2. *See:* Footnote 1, Liberty Mut. Ins. Co. v. Craddock, 26 Md. App. 296, 338 A. 2d 363 (1975).

State or the owner of a motor vehicle registered in this State or a resident of another state, territory, or federal district of the United States or province of the Dominion of Canada, or foreign country, in which recourse is afforded to residents of this State, of substantially similar character to that provided for by this part * * *."

Appellants concede, as indeed they must, that the word "resident" as used in the section has been equated with "domiciliary" by judicial interpretation. In *Maddy v. Jones,* 230 Md. 172, 186 A. 2d 482 (1962), it was said at 179 [485]:

"It is our opinion that the design and the terms of the Act require the conclusion that Sec. 150 (g), defining a 'qualified person' as a 'resident of this State', contemplates one who possesses or has acquired a domiciliary status, in the legal sense, in this State, as distinguished from one who merely has a temporary abode in Maryland. It seems obvious that the Legislature intended, in enacting this statute, primarily to protect its own citizens, particularly those least able financially to bear the loss or injury inflicted by irresponsible or unidentified motorists, many of whose victims otherwise would require medical and welfare attention at public costs. A further significant factor is the reciprocity provision in Sec. 150 (g). This provision (which uses the words 'resident' and 'residents') could logically and effectively apply, we feel, only to domiciliaries of Maryland and of the reciprocating jurisdictions, and not to temporary sojourners. Our conclusion that 'resident' must be equated with 'domiciliary' in this statute is fortified by the fact that the Fund is produced by taxes imposed on all motorists, insured as well as uninsured, whose vehicles are registered in Maryland, and on liability insurance premiums collected in this State. Transients, unless covered by portions of Sec. 150 (g) other than the residence

provision, would not seem to come within the scheme of this legislation."

In *Walsh Admr. v. Crouse,* 232 Md. 386, 387, 194 A. 2d 107, 108 (1963) and in *Rumbel v. Schueler,* 236 Md. 25, 27, 202 A. 2d 368 (1964) the holding in *Maddy, supra,* was expressly reiterated. *Compare: Liberty Mut. Ins. Co. v. Craddock,* 26 Md. App. 296, 338 A. 2d 363 (1975).

Nonetheless, appellants urge upon us that the residency requirement of the statute is unconstitutional under the Equal Protection or Privileges and Immunities Clauses of the Fourteenth Amendment or under Article IV § 2 of the Constitution of the United States. They argue that judicial interpretation of the word "resident" as equated with "domiciliary" under *Maddy, Walsh* and *Rumbel,* all supra, "did not flow out of an analysis of the nature and purpose of the UCJ Law nor does it now comport with constitutional standards."

### *Constitutionality*

Appellants rely upon *Memorial Hospital v. Maricopa County,* 415 U. S. 250, 94 S. Ct. 1076, 39 L.Ed.2d 306 (1974); *Dunn v. Blumstein,* 405 U. S. 330, 92 S. Ct. 995, 31 L.Ed.2d 274 (1972) and *Shapiro v. Thompson,* 394 U. S. 618, 89 S. Ct. 1322, 22 L.Ed.2d 600 (1969). Their reliance is misplaced. The statute in each of the cited cases imposed durational residential requirements upon: (a) health and welfare essentials (hospital care); or (b) a fundamental political right (voting); or (c) the basic necessities of life (welfare payments).

The very language of the Supreme Court in *Memorial Hospital, supra,* at page 255 [1080-81], [313] itself demonstrates the distinction between the statutes struck down in the three cited cases and the subject statute:

> "Even a bona fide residence requirement would burden the right to travel, if travel meant merely movement. But, in Shapiro, the Court explained that '[t]he residence requirement and the one-year

waiting-period requirement are distinct and independent prerequisites' for assistance and only the latter was held to be unconstitutional. Id., at 636, 22 L Ed 2d 600. Later, in invalidating a durational residence requirement for voter registration on the basis of Shapiro, *we cautioned that our decision was not intended to 'cast doubt on the validity of appropriately defined and uniformly applied bona fide residence requirements.'* Dunn v. Blumstein, 405 U. S. 330, 342, n. 13, 31 L.Ed.2d 274, 92 S. Ct. 995 (1972)." (Emphasis added)

In the subject case the statute imposed no durational residential requirement inhibiting the fundamental right to migrate from state to state.

Section 7-602 applied equally to all persons within the boundaries of the State. Its accruing benefits were not conditioned upon durational prerequisites. A person claiming its benefits was required only to demonstrate that she was a resident of the State as that status had been "appropriately defined and uniformly applied" to all sojourners within its borders. There was, in short, no impingement of fundamental constitutional rights.

In the absence of such impingement, the State is not required to make a showing that the statute is "necessary to promote a *compelling* governmental interest." *Shapiro*, supra, at 634, [1331], [615]. Rather, validity of the statute will be determined under the test clearly and succinctly stated in *Md. St. Bd. of Barber Exmrs. v. Kuhn*, 270 Md. 496, 507, 312 A. 2d 216, 222 (1973):

"In cases brought under the Equal Protection Clause of the Fourteenth Amendment, but not involving so-called 'suspect classifications' or 'fundamental personal rights,' the Supreme Court and this Court have applied the more traditional 'rational relationship' or 'fair and substantial relation' tests, which require, at a minimum, that a statutory classification bear some 'rational relationship' to a legitimate state purpose."

The previously quoted language in *Maddy, supra*, clearly demonstrates that the statute meets this test and is valid.

### Applicability of § 7-602 to Appellants

What we have said thus far applies equally to both appellants. Each is bound by the terms of this valid statute and must show that she qualifies as a domiciliary of this State.

Common to both appellants is the critical circumstance that they were minors (Holly age 18 years) (Josiah aged 19 years) at the time of arrival within the State of Maryland and at the time of the accident in which they were injured.[3]

It is uniformly held that the domicile of the father is in legal contemplation the domicile of a minor child, and an infant cannot acquire a domicile on her own volition. 25 Am.Jur.2d *Domicile*, § 63 (1966); 1 Restatement, Conflict of Laws (2d) § 22 (1971); *Sudler v. Sudler*, 121 Md. 46, 50, 88 Atl. 26, 28.

The mere fact that the appellants were minors does not mean, however that this universally recognized rule of law is necessarily dispositive of the subject case. This is so because there is, in some jurisdictions a recognized exception that an emancipated child may acquire a domicile of choice. The exception is thus stated in 1 Restatement, Conflict of Laws, *supra*, at page 90:

> "*f. Emancipated child.* An emancipated child may acquire a domicil of choice. A parent has no power to control the domicil of an emancipated child."

We pass, accordingly, to a consideration of the question whether the appellants were emancipated.

The early case of *Mercer v. Walmsley*, 5 H & J 27 (1820)

---

**3.** Ch. 651 of the Acts of 1973 (Maryland Code Article 1, § 24, 1975 Supp.) whereby the age of majority was lowered from 21 to 18 years had no application to the appellants. Section 51 of that Act provided, *inter alia*: "That the provisions of this Act shall be construed only prospectively and shall not be applied or interpreted to have any effect upon or application to any event or happening occurring prior to the effective date of this Act."

makes plain that emancipation of an infant must emanate from the parent and not the child, saying at page 34:

"* * * the right of the father to the services of the daughter, during minority, depends not on her. Let her design to leave him be ever so determined, she has no legal right so to do, or when from under his roof, she has no right to form a determination never to return; and if such a determination is made, still the father has a right to compel her return, and have the benefit of her services. Nor is it clear to me, that even with the consent of the father, that she should permanently leave his protection, would the case be materially different; for as no contract between the father and minor daughter would be binding, a stipulation or understanding that she should permanently leave him, and shift for herself, would be nugatory. But that is not the case now before the Court."

*Bullett v. Worthington*, 3 Md. Ch. 67 (1851), expressed a similar view, the Court saying at page 71:

"* * * the services were rendered whilst the son lived with the father, and during his minority. Under such circumstances, and, indeed, even though the son did not live with the father, still, being a minor, the father was entitled to his services, and could maintain an action for them, *unless, by some act of his own, he had divested himself of his control over him.*" (Emphasis added)

*Greenwood v. Greenwood*, 28 Md. 369, 381 (1868) although recognizing that a father is entitled to the custody of his minor children and to the value of their labor during minority, declared that such right may be destroyed "by some act of his own." The Court in *Greenwood* went on to say at 384: "In what manner and by what acts this can be done must depend on the special circumstances of each case."

*Malone v. Topfer*, 125 Md. 157, 93 Atl. 397 (1915), and *Lucas v. Maryland Drydock Co.*, 182 Md. 54, 31 A. 2d 637 (1943) recognized the doctrine of emancipation resulting from the forfeiture of parental rights by reason of abandonment or mistreatment.

*Bradford v. Futrell*, 225 Md. 512, 171 A. 2d 493 (1961), discussing tangentially the question of emancipation, said at 520 [497]:

> "Whether the entering of a dependent child into the military service constitutes an emancipation falls under the general principle that whether emancipation has occurred in a given case is a factual question."

We distill from those decisions the following general principle: emancipation of a minor may not be achieved by the voluntary action of the child but may result (a) from abandonment or mistreatment by the parent, or (b) from a voluntary relinquishment of parental rights.

In the subject case there is not the slightest evidence of neglect, misconduct or abandonment by the parents of either Holly or Josiah. We turn, accordingly, to the question whether emancipation of either or both has occurred by reason of voluntary relinquishment of parental rights.

The case of *Parker v. Parker*, 94 S.E.2d 12, 13 (S. Car., 1956) stated what we believe to be the proper test governing determination of the emancipation issue in a given case:

> "Emancipation during minority results not from any act of the child alone, but primarily from agreement of the parent, which may be either express or implied. It may be either partial or complete. If partial, it frees the child for only a part of the period of its minority, or from only a part of the parent's rights, or for some special purpose, such as the right to earn and spend its own wages. If complete, it completely severs the parental relationship so far as legal rights and liabilities are concerned. Whether or not a minor child has been

emancipated depends upon the peculiar facts and circumstances of each case, and is, therefore, generally a question for the jury. Emancipation of a minor child is never presumed, and the burden of proof is upon him who alleges it."

The trial judge concluded from the evidence that "* * * the facts in this case are not sufficient to establish that there was, in fact, emancipation." The trial judge's conclusion upon this factual issue must stand unless our examination of the record shows that it was clearly erroneous. Maryland Rule 1086. Thus, if there is any competent, material evidence directly or by reasonable inference tending to justify that conclusion, we must affirm. *Carling Brewing Co. v. Belzner*, 15 Md. App. 406, 413, 291 A. 2d 175, 179 (1972).

No testimony by the parents of either appellant was presented to the trial judge. We are left, accordingly, to an examination of the record to determine whether emancipation must be implied as a matter of law. We think not.

Common to the claims of both is the circumstance that they undertook to pursue studies at the nursing school for three years and to bind themselves thereafter for two years of service as nurses at the Provident Hospital.

### Further Evidence as to Josiah

Mary Ann Josiah was born in Antigua on January 8, 1952. She was a citizen of the West Indies, in the United States on a student visa. Her parents continued to lend her financial support whenever she needed it after her arrival in Maryland. She came to the United States in April, 1971 with a plan to live with an aunt in Takoma Park and to attend Howard University in Washington, D. C. The decision to attend nursing school in Baltimore was made after arrival. She commenced her classes in September, 1971. She was not qualified for permanent residence in the United States.

Josiah's parents had provided her with funds for her upkeep both initially and in the subsequent course of her schooling. This circumstance alone prevents us from a

declaration that the conclusion of the trial judge was clearly erroneous as to Josiah. Rule 1086.

### Further Evidence as to Holly

The issue as to Holly is not so clear cut. Joann Holly was born in Pennsylvania on April 6, 1953. She came to Baltimore in September, 1971 to become a nursing student at the Helene Fuld School of Nursing in Baltimore. Her parents at all times were residents of Pennsylvania. She had a Pennsylvania driver's license. She registered to vote in Maryland — after the accident. When asked about her future plans at the time she came to Baltimore in September, 1971 she replied, "Well, I was planning to stay here for at least the next five years. I didn't know what I was going to do after that."

The testimony showed she was self-supporting without financial contributions by the parents subsequent to her arrival within this State. Her stay in Maryland prior to the accident and injury had been of only about two months duration. We do not regard these circumstances as conclusively establishing emancipation for the full period of her minority. Nor do they demonstrate as a matter of law, the voluntary relinquishment of all parental rights. Although the issue is close, we cannot declare, as a matter of law, that the evidence shows a voluntary relinquishment of all parental rights and obligations. We must recognize that the contractual undertaking with the nursing school was voidable during infancy. We must recognize also that the parents may have, during the minority of their child, required her to return to Pennsylvania. The trial judge was not required to assume that parental control had been fully relinquished; or parental responsibility ended.

Because we conclude that the decision of the trial judge was not clearly erroneous, we do not reach the interesting question whether the emancipation of a minor child encompasses the right to acquire a domicile of choice.

The contention that appellants may qualify under the statute as "apprentices" of Provident Hospital was not

raised below. It is not before us. Rule 1085. In any event there is no evidence that either appellant qualified as an apprentice as defined in Article 100, § 96 (f).

*Judgments affirmed.*
*Costs to be paid by appellants.*