# CHARLESTON.

## WHITE v. TENNANT.

Submitted June 26, 1888.—Decided December 1, 1888.

1. DOMICILE—CHANGE OF RESIDENCE—INTENT.
    Where a person entirely abandons his former residence in one State with no intention of resuming it and goes with his family to another residence, which he has rented in another State, with the intention of making the latter his residence for an indefinite time, the latter State is his domicile notwithstanding the fact, that, after he and his family arrive at the new residence, which is only about a half a mile from the State line, they go on the same day on a visit to spend the night with a neighbor in the former State intend-

ing to return in the morning of the next day, but he is detained there by sickness, until he dies, and never does in fact return to his new home. (pp. 796, 797.)

2. DOMICILE—CONFLICT OF LAWS—DISTRIBUTION OF PROPERTY.

The laws of the State, in which the domicile of a decedent is at the time of his death, control and govern the distribution of his personal estate, although he may die in another State. (p. 797.)

*P. H. Keck* and *J. M. Hagans* for appellants.

*Berkshire, Sturgiss & Baker* and *A. F. Haymond* for appellees.

SNYDER, JUDGE :

This is a suit brought December, 1886, in the Circuit Court of Monongalia county by William L. White and others against Emrod Tennant, administrator of Michael White deceased and Lucinda White, the widow of said Michael White, to set aside the settlement and distribution made by the administrator of the personal estate of said decedent, and to have the same settled and distributed according to the laws of the State of Pennsylvania, which State it is claimed was the domicile of said decedent at the time of his death. The plaintiffs are the brothers and sisters of the decedent, who died in this State intestate. On October 28, 1887, the court entered a decree dismissing the plaintiffs' bill, and they have appealed.

The sole question presented for our determination is, whether the said Michael White at the time of his death, in May, 1885, had his legal domicile in this State or in the State of Pennsylvania. It is admitted to be the settled law, that the law of the State, in which the decedent had his domicile at the time of his death, will control the succession and distribution of his personal estate. Before referring to the facts proved in this cause, we shall endeavor to determine what in law is meant by " domicile."

Dr. Wharton says : " ' Domicile ' is a residence acquired as a final abode. To constitute it there must be (1) residence, actual or inchoate ; (2) the non-existence of any intention to make a domicile elsewhere." Whart. Confl. Law § 21. " ' Domicile ' is that place or country, either (1) in

which a person in fact resides with an intention of residence,—*animus manendi;* or (2) in which, having so resided, he continues actually to reside, though no longer retaining the intention of residence,—*animus manendi;* or (3) with regard to which, having so resided there, he retains the intention of residence,—*animus manendi,*—though he, in fact no longer resides there." Dicey Dom. 44. Two things must concur to establish domicile,—the fact of residence, and the intention of remaining. These two must exist, or must have existed, in combination. There must have been an actual residence. The character of the residence is of no importance; and, if domicile has once existed, mere temporary absence will not destroy it, however long continued. *Munro* v. *Munro,* 7 Cl. & Fin. 842. The original domicile continues until it is fairly changed for another. It is a legal maxim that every person must have a domicile somewhere; and he can have but one at a time for the same purpose. From this it follows that one can not be lost or extinguished until another is acquired. *Baird* v. *Byrne,* 3 Wall. Jr. 1. When one domicile is definitely abandoned and a new one selected and entered upon, length of time is not important; one day will be sufficient, provided the *animus* exists. Even when the point of destination is not reached, domicile may shift *in itinere,* if the abandonment of the old domicile and the setting out for the new are plainly shown. *Munroe* v. *Douglass,* 5 Madd. 405. Thus a constructive residence seems to be sufficient to give domicile, though an actual residence may not have begun. Whart. Confl. Law, § 58. A change of domicile does not depend so much upon the intention to remain in the new place for a definite or indefinite period as upon its being without an intention to return. An intention to return however at a remote or indefinite period to the former place of actual residence will not control, if the other facts, which constitute domicile, all give the new residence the character of a permanent home or place of abode. The intention and actual fact of residence must concur, where such residence is not in its nature temporary. *Hallet* v. *Bassett,* 100 Mass. 170, 171; *Long* v. *Ryan,* 30 Gratt. 718. In *Bradley* v. *Lowery,* 1 Speer Eq. 1, it is held, that " change of domicile is consummated when one leaves the

State where he has hitherto resided, avowing his intention not to return, and enters another State intending to permanently settle there." A domicile once acquired remains until a new one is acquired elsewhere, *facto et animo.* Story Confl. Law, § 47; *Hart* v. *Lindsey,* 17 N. H. 235. Where a person removes from one State to another and establishes a fixed residence in the latter, it will become his domicile, although there may be a floating intention to return to his former place of abode at some future period. *Ringgold* v. *Barley,* 5 Md. 186. "If a man intending to remove with his family visits the place of removal beforehand, to make arrangements, or even sleeps there occasionally for convenience and then transfers his family, the change of domicile takes effect from the time of removing with the family; but if he has definitely changed his residence and taken up his abode permanently in a new place, the fact, that his family remains behind, until he can remove them conveniently, and that he visits them occasionally, will not prevent the new place being his domicile." *Guier* v. *O'Daniel,* Amer. Lead. Cas. (753,) 903; *Cambridge* v. *Charlestown,* 13 Mass. 501.

The material facts in the case at bar are as follows: Joseph S. White, the father of the plaintiffs and Michael White, died intestate in Monongalia county seized of a tract of about 240 acres of land, of which about forty acres lay in Greene county, Pa., the whole constituting but one tract or farm. The mansion-house in which the father resided was located on the West Virginia side of the farm, and there was also a dwelling-house generally occupied by tenants on the Pennsylvania part of the farm. After the death of the father, his widow and the plaintiffs remained together and occupied the home-farm, residing in the mansion-house in West Virginia. Michael White several years before his death married the defendant, Lucinda White, a daughter of the defendant, Emrod Tennant, and about that time purchased a farm on Day's run, in Monongalia county, some fifteen miles from the home-place, to which he moved, and at which he and his wife resided. It is conceded, that Michael was born and had his domicile in West Virginia all his life, until about April 1, 1885.

In the winter of 1884–85, Michael sold his Day's run farm, and then rented or made an arrangement with his mother and brothers and sisters, the plaintiffs, to occupy the forty acres of the home-farm, in which he still had an undivided interest, and to live in the house on said forty acres in Greene county, Pa. He was to give to the purchaser the possession of his Day's run farm on April 1, 1885, and to have possession of the Pennsylvania house and forty acres at the same time. In March, 1885, he moved part of his household-goods into the Pennsylvania house, and put them into one of the rooms by permission of the tenant, who then occupied it, and who did not vacate it until between the middle and last of March, 1885. About the same time he moved an organ and some grain to the old homestead, until he could get possession of the Pennsylvania house.

On the morning of April 2, 1885, he finally left the Day's run house with the remainder of his goods and his wife, he having no children, with the declared intent and purpose of making the Pennsylvania house his home that evening. He with his team, wife and goods and live-stock passed into the State of Pennsylvania several miles before he reached said house and continued in said State thence to said Pennsylvania house, where they arrived that evening about sundown, and then and there unloaded their goods and put them in the house, setting up one bed and turning the fowls and other live-stock loose at the house.

The said house had been vacated for several days. It was a damp, cool day, and the house was found to be damp and uncomfortable. The wife was complaining of feeling unwell, and in consequence of that fact and the uncomfortable condition of the house, on the invitation of her brother-in-law and others of the family who then resided at the mansion-house, but a short distance therefrom, the said Michael and his wife went to the mansion-house in West Virginia to stay all night and return in the morning. Before leaving the Pennsylvania house the wife had gotten out of the buggy at the house, and the said Michael after putting into it his household-goods locked the door and took the key with him. On the following morning, the wife still feeling unwell, and the brother who was to return the team, which

they had used in moving their goods, having taken sick, the wife after going to the Pennsylvania house to milk returned to the mansion-house, and Michael took the team back to Day's run.

On the return of Michael from this trip he found his wife so sick with typhoid fever, that it was impossible to move her, in consequence of which both he and she remained at the mansion-house,—she because she was unable to get away, and he to wait on her,—but he went daily over to the Pennsylvania house to look after it, and to feed his stock there, calling it his " home." In ten or fifteen days, and before the wife had sufficiently recovered to leave her bed, Michael was attacked with typhoid fever, and about ten days thereafter died intestate in the same house. The wife recovered, and the defendant, Emrod Tennant, her father, administered on the estate of Michael, taking out letters of administration in Monongalia county, W. Va. The administrator settled his accounts before a commissioner of said county, and distributed the estate according to the laws of West Virginia; that is, by paying over to the widow the whole personal estate remaining after the payment of the debts of the decedent. It is admitted, that, if the distribution had been according to the laws of the State of Pennsylvania, the wife would have been entitled to the one half only of said estate, and the plaintiffs would have been entitled to the other half.

As the law of the State, in which the decedent had his domicile at the time of his death, must govern the distribution of his estate, the important question is, where, according to the foregoing facts, was the domicile of Michael at the time of his death? It is unquestionable, that prior to the 2d day of April, 1885, his domicile was and had been in the State of West Virginia. Did he on that day or at any subsequent day change his domicile to the State of Pennsylvania? According to the authorities hereinbefore cited, if it is shown, that a person has entirely abandoned his former domicile in one State with the intention of making his home at a fixed place in another State with no intention of returning to his former domicile and then establishes a residence in the new place for any period of time, however brief, that will be in

law a change of domicile, and the latter will remain his domicile until changed in like manner.

The facts in this case conclusively prove, that Michael White, the decedent, abandoned his residence in West Virginia with the intention and purpose not only of not returning to it, but for the expressed purpose of making a fixed place in the State of Pennsylvania his home for an indefinite time. This fact is shown by all the circumstances as well as by his declarations and acts. He had sold his residence in West Virginia and surrendered its possession to the purchaser, and thereby made it impossible for him to return to it and make it his home. He rented a dwelling in Pennsylvania, for which he had no use except to live in and make it his home. In addition to all this, he had moved a part of his household goods into this house, and then, on the 2d of April, 1885, he with his family and the remainder of his goods and stock finally left his former home and the State of West Virginia, and moved into the State of Pennsylvania to his house in that State, and there put his goods in the house, and turned his stock loose on the premises. At the time he left his former home on that morning, and while he was on the way to his new home, his declared purpose and intention were to make that his home from that very day, and to occupy it that night. He arrived in Pennsylvania and at his new home with that intention; and it was only after he arrived there and for reasons not before known, which had no effect to change his purpose of making that his future home, that he failed to remain there from that time. There was no change in his purpose, except that after he arrived at his new home and unloaded and left his property there, he concluded on account of the condition of the house and the illness of his wife, that it would be better to go with his wife to remain one night with his relatives and return the next morning.

When he left his former home without any intention of returning and in pursuance of that intention did in fact move with his family and effects to his new home with the intention of making it his residence for an indefinite time, it is my opinion, that, when he and his wife arrived at his new home, it became *eo instanti* his domicile, and that his leaving there under the circumstances with the intention of returning the

next day did not change the fact. The concurrence of his intention to make the Pennsylvania house his permanent residence with the fact, that he had actually abandoned his .former residence and moved to and put his goods in the new one, made the latter his domicile. According to the authorities hereinbefore referred to he must of necessity have had a domicile somewhere. If he did not have one in Pennsylvania, where did he have one? The fact, that he left the Pennsylvania house, after he had moved to it with his family and goods, to spend the night, did not revive his domicile at his former residence on Day's run, because he had sold that, and left it without any purpose of returning there. By going from his new home to the house of his relatives to spend the night he certainly did not make the house thus visited his domicile; therefore, unless the Pennsylvania house was on the evening of April 2, 1885, his domicile, he was in the anomalous position of being without a domicile anywhere, which, as we have seen, is a legal impossibility ; and, that house having become his domicile, there is nothing in this case to show, that he ever did in fact change or intend to change it or to establish a domicile elsewhere.

It follows, therefore, that that house remained his domicile up to and at the time of his death ; and, that house being in the State of Pennsylvania, the laws of that State must control the distribution of his personal estate notwithstanding the fact, that he died in State of West Virginia.

For these reasons the decree of the Circuit Court must be reversed, and the cause must be remanded to that court to be there further proceeded in according to the principles announced in this opinion and the rules of courts of equity.

REVERSED. REMANDED.