644 A.2d 498

**Dilber E. GARCIA**

v.

**Victorino A. ANGULO et al.**

**No. 89, Sept. Term, 1993.**

Court of Appeals of Maryland.

July 15, 1994.

Joseph A. Trevino, Greenbelt, for appellant.

Stephen S. Brown (Victor I. Weiner, Lipshultz and Hone, Chartered, all on brief), Silver Spring, for appellee.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, CHASANOW and BELL, JJ., and CHARLES E. ORTH, Jr.* and JOHN F. McAULIFFE, Associate Judges of the Court of Appeals (retired), Specially Assigned.

RODOWSKY, Judge.

Involved here is the interrelation of the Maryland common law of domicile with an uncodified federal immigration statute and with presidential directives that have conferred protection from deportation on nationals of El Salvador who had illegally entered the United States. The principal question is whether federal law prevents an alien's intent to be domiciled in Maryland from having legal effect. This issue arises on an appeal from a circuit court's refusal to direct the Maryland Automobile Insurance Fund (MAIF) to pay a judgment entered against an uninsured motorist.

---

* ORTH, J., participated in the hearing of this case and in the conference in regard to its decision but died prior to the adoption of the opinion by the Court.

The appellant, Dilber E. Garcia (Garcia), was injured on December 13, 1991 in Langley Park, Maryland while riding as a passenger in a pickup truck owned by Victorino A. Angulo (Victorino) and operated by his son, Saul Angulo (Saul). The truck, temporarily registered in Pennsylvania, seems to have been uninsured. Saul failed to stop at a stop sign, and the truck collided with a bus. Garcia sued Victorino, and by amendment joined Saul, in the Circuit Court for Prince George's County. Saul was served, failed to plead, and an order of default was entered against him. Victorino appeared, but ultimately was voluntarily dismissed. By an agreement between Garcia and MAIF, judgment by default in the amount of $12,000 was entered against Saul. Garcia, pursuant to Maryland Rule BW 6.a, then petitioned the court in the same action for an order directing MAIF to pay the judgment.

MAIF opposed on the ground that Garcia was not a "qualified person" under Maryland Code (1957, 1994 Repl.Vol.), Art. 48A, § 243H(a)(1). It provides, under the circumstances therein set forth, for claims against, and payment by, MAIF for "personal injury to a qualified person." Article 48A, § 243L(e) defines "qualified person" to mean, in relevant part,

"a resident of this State or the owner of a motor vehicle registered in this State or a resident of another state, territory, or federal district of the United States or province of the Dominion of Canada, or foreign country, in which recourse is afforded to residents of this State, of substantially similar character to that provided for by this subtitle . . . ."

The term "qualified person" in Art. 48A, § 243L(e) is derived from Md.Code (1957), Art. 66½, § 150(g), defining "qualified person" for purposes of eligibility to claim against the former Unsatisfied Claim and Judgment Fund. Cases decided under the predecessor statute have established that "resident of this State" in the definition of "qualified person" means a domiciliary of Maryland. *See Hawks v. Gottschall,* 241 Md. 147, 215 A.2d 745 (1966); *Walsh v. Crouse,* 232 Md. 386, 194 A.2d 107 (1963); *Maddy v. Jones,* 230 Md. 172, 186 A.2d 482 (1962); *Holly v. Maryland Auto. Ins. Fund,* 29

Md.App. 498, 349 A.2d 670 (1975); *Liberty Mut. Ins. Co. v. Craddock,* 26 Md.App. 296, 338 A.2d 363 (1975). No party to the present action argues that these holdings have been altered by the transfer of the uninsured motorist program to MAIF. Indeed, these holdings underlie the arguments of the parties here and in the circuit court.

The circuit court conducted a hearing on Garcia's petition against MAIF, at which Garcia testified, exhibits were introduced, and the following facts were developed. At age nineteen, in 1990, Garcia left his native El Salvador to travel to the United States. He explained:

> "I left my country to look for a better life, and I was very frightened of the war because at that time they were killing a lot of young men. And my mother was scared that they were going to kill me, so I decided to leave my country and I came."

He also stated that he wanted "[t]o be able to study, work, and do something better."[1]

Garcia entered Mexico illegally and made his way on foot and by bus to the Rio Grande. He crossed into the United States in the vicinity of Brownsville, Texas, without visa, and without presenting himself to the immigration authorities. Garcia traveled to Maryland where he has lived continuously since March 1990, principally in the Takoma Park–Silver Spring area.

Prior to the accident of December 13, 1991, Garcia obtained a social security number, a Maryland Motor Vehicle Administration identification card, and a replacement passport from

---

1. Garcia does not contend that he is eligible for political asylum. To be eligible for political asylum pursuant to 8 U.S.C. § 1101(a)(42)(A) (1988), an alien must show "a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion...." There is no evidence in the record that suggests that Garcia has reason to fear persecution in El Salvador on account of any of the statutorily enumerated reasons. For a thorough discussion of the strict requirements for obtaining asylum, see 2 C. Gordon & S. Mailman, *Immigration Law and Procedure* § 34.02[7] (1993).

the Republic of El Salvador.[2]  He worked as a carpenter and as a painter.  He did not file 1990 income tax returns by the April 15, 1991 filing deadline, and there is no evidence that the time for filing was officially extended.  After the accident, on or about January 27, 1992, Garcia filed federal and Maryland 1990 income tax returns reporting taxable income of $1,336 from his sole proprietorship as a contractor.  Thus, there was no withholding of taxes by the person for whom Garcia rendered services.  The explanation for the delay in filing, presented by Garcia to the circuit court, was that he had not been furnished with the tax form reflecting 1990 payments to him until January 1992.

Garcia also obtained from the Immigration and Naturalization Service (INS) on October 28, 1991 what he referred to as a "work permit."  A copy of this card was introduced into evidence.  Its legal significance will be described, *infra.*  Garcia has no intention of returning to El Salvador.  Although he understands that he is in the United States only until temporary protection expires, he thinks that INS "will turn these permissions into a green card," *i.e.,* permanent resident alien status.  *See* W. Wilburn, *Strangers in Paradise: An Overview of Maryland State Law Dealing With Noncitizens,* 21 U.Balt.L.Rev. 87, 90 (1991).

The circuit court concluded that Garcia was not a qualified person because he was not a domiciliary of Maryland on December 13, 1991.  Garcia appealed to the Court of Special Appeals, but this Court issued the writ of certiorari on its own motion prior to consideration of the matter by the Court of Special Appeals.

In this Court the parties disagree as to the rationale that the circuit court applied in reaching its conclusion.[3]  MAIF

---

2.  Garcia testified that he lost his original passport somewhere in Mexico.

3.  The entire oral opinion of the circuit court is set forth below:
    "Very well.  Madam Clerk, the Court finds based on all the evidence in the file and that adduced during the hearing that plaintiff Gilbert

seeks to make the case an entirely factual one, emphasizing that the circuit court could have found a lack of intent to establish a Maryland domicile. Garcia, on the other hand, submits that the issue is one of law. He interprets the record to reflect that the circuit court applied an erroneous legal standard, by limiting the possibility of an alien's obtaining Maryland domicile only to persons recognized by the INS as permanent resident aliens.

■ We agree with Garcia that the domicile issue here turns on the status of Salvadorans who have illegally entered the United States. The factual component of the domicile issue focuses on Garcia's intent as of the date of the accident. *See Hawks v. Gottschall,* 241 Md. at 153, 215 A.2d at 749 (trial court fact-finding of domicile reversed for insufficient evidence where this Court could "find nothing that [the claimant] had done prior to the 1961 accident which would distinguish him from any other soldier who, during the course of his military career, happens to become stationed in Maryland but who still retained his domicile in another state"). With respect to the legal status component of the domicile issue, however, appellate courts decide cases according to the law in effect at the time of decision, absent some impairment of constitutional rights by a subsequent enactment. *See Pickett v. Prince George's County,* 291 Md. 648, 662, 436 A.2d 449, 457 (1981). Here, for reasons which we shall explain, there is no material contradiction of Garcia's testimony that he intended to make Maryland his home. In addition, this Court can decide the purely legal issue without first determining the rationale applied by the circuit court.

■ An overview of the various classes of aliens under United States law was furnished in *Mathews v. Diaz,* 426 U.S. 67, 79–80 n. 13, 96 S.Ct. 1883, 1891 n. 13, 48 L.Ed.2d 478, 489–90 n. 13 (1976), where the Court said:

[sic] E. Garcia on December 13, 1991 was not a domiciliary of the State of Maryland. Judgment is entered in favor of the defendant and against the plaintiff for costs."

"The classifications among aliens established by the Immigration and Nationality Act, 66 Stat. 163, as amended, 8 U.S.C. § 1101 *et seq.* (1970 ed. and Supp. IV), illustrate the diversity of aliens and their ties to this country. Aliens may be immigrants or nonimmigrants. 8 U.S.C. § 1101(a)(15). Immigrants, in turn, are divided into those who are subject to numerical limitations upon admissions and those who are not. The former are subdivided into preference classifications which include: grown unmarried children of citizens; spouses and grown unmarried children of aliens lawfully admitted for permanent residence; professionals and those with exceptional ability in the sciences or arts; grown married children of citizens; brothers and sisters of citizens; persons who perform specified permanent skilled or unskilled labor for which a labor shortage exists; and certain victims of persecution and catastrophic natural calamities who were granted conditional entry and remained in the United States at least two years. 8 U.S.C. § 1153(a)(1)–(7). Immigrants not subject to certain numerical limitations include: children and spouses of citizens and parents of citizens at least 21 years old; natives of independent countries of the Western Hemisphere; aliens lawfully admitted for permanent residence returning from temporary visits abroad; certain former citizens who may reapply for acquisition of citizenship; certain ministers of religion; and certain employees or former employees of the United States Government abroad. 8 U.S.C. §§ 1101(a)(27), 1151(a), (b). Nonimmigrants include: officials and employees of foreign governments and certain international organizations; aliens visiting temporarily for business or pleasure; aliens in transit through this country; alien crewmen serving on a vessel or aircraft; aliens entering pursuant to a treaty of commerce and navigation to carry on trade, or an enterprise in which they have invested; aliens entering to study in this country; certain aliens coming temporarily to perform services or labor or to serve as trainees; alien representatives of the foreign press or other information media; certain aliens coming temporarily to participate in a program in

their field of study or specialization; aliens engaged to be married to citizens; and certain alien employees entering temporarily to continue to render services to the same employers. 8 U.S.C. § 1101(a)(15). In addition to lawfully admitted aliens, there are, of course, aliens who have entered illegally."

Garcia's precise status is none of the above. Although he entered the United States illegally, Congress specifically addressed Salvadorans in Garcia's class.

Relevant to the problem before us are two sections amending the Immigration and Nationality Act of 1952, 8 U.S.C. §§ 1101 through 1557 (1988 & Supp. V 1993). Both sections were enacted as part of the Immigration Act of 1990, Pub.L. 101–649, 104 Stat. 4978, 5030–38. One section, § 302 of the 1990 Act (hereinafter § 302), is codified at 8 U.S.C. § 1254a. The other section, § 303 of the 1990 Act (hereinafter § 303), is uncodified. Section 303 is set forth in the Historical and Statutory Notes following 8 U.S.C.A. § 1254a (West Supp. 1994).

A synopsis comparing the two sections is set forth below. "[S]ection 302 [is] entitled Temporary Protected Status. Temporary Protected Status (TPS) codifies a new category of relief from deportation for illegal aliens in the United States. Under TPS, the Attorney General, given certain circumstances, may grant aliens of specific nationalities a temporary stay from deportation for up to eighteen months. If this designation is made, designated aliens are authorized to work in the United States as long as the temporary stay is in effect. Congress also provided a specific application of this general provision for TPS in section 303 of the 1990 Act. ' Section 303 designates TPS to nationals of El Salvador who were physically present in the United States on September 19, 1990."

P. Diamond, *Temporary Protected Status Under The Immigration Act of 1990*, 28 Willamette L.Rev. 857, 857–58 (1992) (footnotes omitted).

Sections 302 and 303 are the product of a compromise in a conference committee on differing versions of S. 358 of the 101st Congress. *See* 136 Cong.Rec. H. 13235 *et seq.* (daily ed. Oct. 26, 1990). The Senate Bill was concerned exclusively with Chinese students in the United States. *Id.* at 13238. The House amendment created the new TPS category and specified that "certain nationals of El Salvador, Lebanon, Liberia, and Kuwait be granted [TPS] for three years." *Id.* The conference committee explained that

> "[t]he Conference substitute provides for the establishment of the House's temporary protected status program, but requires the Attorney General to provide such status only to Salvadorans and only for a period of 18 months.... The Conferees underscore that the mandatory conferral of such status on Salvadorans for 18 months shall not be interpreted as preventing the Attorney General, in his sole discretion, [from] providing additional periods of protection should circumstances in the future so warrant."

*Id.*

Section 303, the direct congressional conferral of the new TPS on certain Salvadorans, took effect November 29, 1990 and provided that it would "remain in effect until the end of the 18–month period beginning January 1, 1991," that is, until June 30, 1992. § 303(a)(2). Thus, when Garcia was injured in the accident caused by an uninsured motorist, his protected status would have continued for about six and one-half months under the then federal law.

Garcia met the conditions for § 303 TPS. He had "been continuously physically present in the United States since September 19, 1990." § 303(b)(1)(A). There is no suggestion that he was disqualified under § 303(b)(1)(B), dealing with ineligibility that is largely based on specified criminal conduct. Garcia registered for TPS between January 1 and October 31, 1990, as required by § 303(b)(1)(C). Upon registration Garcia became entitled to the "work permit" issued October 28, 1991 and effective for a period of six months. § 303(c)(3); 8 C.F.R. § 240.45 (1994). INS regulations refer to the card as an

"employment authorization document" (EAD). 8 C.F.R. § 274a.12(a)(12) (1994).

Of particular significance for the issue before us is § 303(d)(1) which provides as follows:

"At the registration occurring under this section closest to the date of termination of the designation of El Salvador under subsection (a) [*i.e.*, June 30, 1992], the [INS] shall serve on the alien granted temporary protected status an order to show cause that establishes a date for deportation proceedings which is after the date of such termination of designation. If El Salvador is subsequently designated under [§ 302] the Service shall cancel such orders."

To date, the Attorney General has not exercised the power under § 302 to designate El Salvador as a nation whose nationals are entitled to TPS. Further, Congress allowed § 303 to expire by its terms on June 30, 1992. Neither action was required, however, effectively to extend TPS for Salvadorans who had entered the United States illegally. This is because of the presidential actions described below.

President George Bush in a May 4, 1992 letter to Salvadoran President Alfredo Christiani "said that the Attorney General will grant Salvadorans 'deferred enforced departure' [DED] for one year beyond June 30, 1992 when the TPS program is scheduled to end." 69 Interpreter Releases 600 (May 18, 1992). A "senior INS official" was reported to have said "that there is no practical difference between DED and TPS for Salvadorans." *Id.* at 601. Apparently based on President Bush's letter, INS by a cable sent on May 15, 1992, instructed its field offices immediately to implement DED. 69 Interpreter Releases 680 (June 1, 1992). INS field offices were to continue to issue orders to show cause, per § 303(d)(1), but to "indicate that the date of hearing is 'to be set.' " *Id.* By a Federal Register notice issued June 19, 1992, the Commissioner, INS, advised that the presidential directive "that the deportation of Salvadoran nationals who were granted TPS not be enforced before June 30, 1993," had been issued "because El Salvador cannot currently accommodate

the repatriation of approximately 150,000 people granted TPS." 57 Fed.Reg. 28701 (1992).

As the June 30, 1993 expiration of DED approached, the Acting Commissioner, INS, published a notice of extension of DED for nationals of El Salvador, dated June 2, 1993. 58 Fed.Reg. 32157 (1993). It noted that approximately 83,000 persons had applied for DED and, "[b]ecause immediate repatriation of more than 83,000 persons would have a serious negative impact on the evolving situation in El Salvador, President Clinton has directed that DED be extended for an additional eighteen months, until December 31, 1994." *Id.* The notice also advised that the INS was "granting an automatic extension until October 31, 1993, of the validity" of any previously issued EAD. *Id.*

Garcia argues that his situation is analogous to that of the nonimmigrant aliens who successfully challenged increased tuition charged to them by the University of Maryland as compared to the tuition charged to United States citizens who were domiciliaries of Maryland.[4] The plaintiffs held "G–4" visas as members of the immediate families of officers or employees of international treaty organizations whom 8 U.S.C. § 1101(a)(15)(G)(iv) authorizes to reside in the United States. In *Elkins v. Moreno,* 435 U.S. 647, 98 S.Ct. 1338, 55 L.Ed.2d 614 (1978), the Court addressed whether, under the Immigration and Nationality Act of 1952, G–4 aliens had the legal capacity, as a matter of federal law, to change their domicile from a foreign nation to the United States, and specifically, to Maryland.

The Court noted that "[a]lthough nonimmigrant aliens can generally be viewed as temporary visitors to the United States, the nonimmigrant classification is by no means homo-

---

**4.** The chronological progression of the litigation is *Moreno v. University of Md.,* 420 F.Supp. 541 (D.Md.1976), *aff'd,* 556 F.2d 573 (4th Cir.), *cert. granted,* 434 U.S. 888, 98 S.Ct. 260, 54 L.Ed.2d 173 (1977); *Elkins v. Moreno,* 435 U.S. 647, 98 S.Ct. 1338, 55 L.Ed.2d 614 (1978); *Toll v. Moreno,* 284 Md. 425, 397 A.2d 1009 (1979); *Toll v. Moreno,* 441 U.S. 458, 99 S.Ct. 2044, 60 L.Ed.2d 354 (1979); *Moreno v. Toll,* 480 F.Supp. 1116 (D.Md.1979); and *Moreno v. Toll,* 489 F.Supp. 658 (D.Md.1980).

geneous with respect to the terms on which a nonimmigrant enters the United States." 435 U.S. at 665, 98 S.Ct. at 1349. For example, alien visitors who declare a business or pleasure purpose for entering this country have no intent, by definition, to abandon their existing domiciles and, absent additional factors, would be subject to deportation if their true intent were to establish domicile here. There were, however, no comparable statutory restrictions on the intent of aliens who qualified for G–4 status. The Court said that "Congress' silence is therefore pregnant, and we read it to mean that Congress, while anticipating that permanent immigration would normally occur through immigrant channels, was willing to allow nonrestricted nonimmigrant aliens to adopt the United States as their domicile." *Id.* at 666, 98 S.Ct. at 1349.

The Court then considered the consequences on domicile if a G–4 alien were to terminate employment with an international treaty organization, thereby causing the entire family to lose the G–4 status. Under those circumstances, prior to 1952, the nonimmigrant alien would have to leave the United States and apply for an immigrant visa at a consulate abroad. Under the 1952 Immigration and Nationality Act, a nonimmigrant alien could utilize a mechanism under 8 U.S.C. § 1255 termed "adjustment of status" to apply for permanent resident status. *Id.* at 667, 98 S.Ct. at 1350. Citing a decision in which the Board of Immigration Appeals said that adjustment of status would ordinarily be granted, in the exercise of discretion and absent adverse factors, the Court concluded that G–4 aliens could adjust their status "to that of a permanent resident without difficulty." *Id.* at 668, 98 S.Ct. at 1350.

The Court, having found no federal obstacle to G–4 aliens becoming domiciliaries of Maryland, then certified to this Court the question of whether G–4 aliens were " 'incapable as a matter of state law of becoming domiciliaries of Maryland.' " *Id.* at 669, 98 S.Ct. at 1351.

The certified question was answered in *Toll v. Moreno,* 284 Md. 425, 397 A.2d 1009 (1979). We reviewed the basic principles for determining domicile. *Id.* at 438–42, 397 A.2d at

1015–17. We quoted from *Dorf v. Skolnik*, 280 Md. 101, 116, 371 A.2d 1094, 1102 (1977), the definition of domicile as " 'the place with which an individual has a settled connection for legal purposes and the place where a person has his true, fixed, permanent home, habitation and principal establishment, without any present intention of removing therefrom, and to which place he has, whenever he is absent, the intention of returning.' "

*Toll*, 284 Md. at 438, 397 A.2d at 1015.

The University argued that G–4 visa holders could not become domiciled in Maryland because they paid no income taxes to Maryland, could not vote in Maryland, and were not permitted to remain here indefinitely. Noting that the latter objection was "effectively undercut" by the Supreme Court's opinion, *id.* at 442, 397 A.2d at 1017, this Court stated the following principle of Maryland domicile law:

"If under federal law a particular individual must leave this country at a certain date, or cannot remain here indefinitely, then he could not become domiciled in Maryland. Any purported intent to live here indefinitely would be inconsistent with law. It would at most be an unrealistic subjective intent, which is insufficient under Maryland law to establish domicile."

*Id.* at 442–43, 397 A.2d at 1017–18. Thus, we held that "if in a particular case [a G–4 visa holder] intends for Maryland to be his fixed place of abode and intends to remain here indefinitely, he will have satisfied the Maryland standard for establishing domicile in this State." *Id.* at 443, 397 A.2d at 1018.

Applying the analysis that we employed in *Toll* to the facts of the instant matter reflects that Garcia's intent to reside indefinitely in Maryland is not "an unrealistic subjective intent" that is "inconsistent with law." *Id.* At the time of the accident Garcia enjoyed TPS, which, although due to expire in June 1992, was effectively extended as DED by President Bush. That extension, although due to expire on June 30, 1993, was further extended by President Clinton. As we write, that extension is not due to expire until December 31,

1994. Although there is a date certain when Garcia's current DED will expire, there is no certainty as to when, if ever, he will receive a notice of deportation. Therefore, Garcia's intent to remain in Maryland is not inconsistent with present federal law. Were one to attempt to predict what the status will be as of January 1, 1995 of Salvadorans who have entered this country without inspection, the pattern of the past federal actions might well lead one to conclude that there will be a further postponement, in some fashion, of a vigorous deportation campaign. It is not appropriate, however, for this Court to engage in that speculation. "Matters relating 'to the conduct of foreign relations ... are so exclusively entrusted to the political branches of [the federal] government as to be largely immune from judicial inquiry or interference.'" *Regan v. Wald,* 468 U.S. 222, 242, 104 S.Ct. 3026, 3038, 82 L.Ed.2d 171, 186 (1984) (quoting *Harisiades v. Shaughnessy,* 342 U.S. 580, 589, 72 S.Ct. 512, 519, 96 L.Ed. 586, 598 (1952)). We cannot predict the outcome of political judgments that are yet to be made. We can only be guided by federal law as it stands on the date of our decision. Under that law and Maryland domicile law, Garcia's intent is not an unrealistic subjective intent.

MAIF's principal factual argument seems to have been inspired by that part of the reasoning of the Supreme Court in *Elkins v. Moreno* that relied on adjustment of status by G–4 nonimmigrant aliens. Garcia never has applied for adjustment of status. MAIF contends that this inaction evidences a lack of intent to reside indefinitely in Maryland and thereby supports the trial court's conclusion. The defect in MAIF's argument is that Garcia's inaction could not evidence disinterest on Garcia's part in permanent residence status. The Office of General Counsel, INS, in an opinion of March 4, 1991, concluded that "[a]n alien who entered the United States without inspection is ineligible for adjustment of status." 68 Interpreter Releases 483, 483 (Apr. 22, 1991). The advisory opinion assumes a Salvadoran who entered the United States illegally, received TPS, and then was approved for an immigrant visa. General Counsel noted that amendments in 1986

to § 245(c) of the INA, 8 U.S.C. 1255(c), were intended " 'to make adjustment of status a much less frequently used method of obtaining permanent residence status in the United States.' S.Rep. No. 99–132, 99th Cong., 1st Sess. 31 (1985)." *Id.* at 484–85.

The unavailability of adjustment of status does not affect the special provisions for Salvadorans who entered illegally that are presently in effect under presidential directive.

*JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY REVERSED. COSTS TO BE PAID BY THE APPELLEE.*

CHASANOW and BELL, JJ., concur.

CHASANOW, Judge, concurring:

I concur in the Court's holding that Garcia is a domiciliary of the State of Maryland. My reasons for writing separately are twofold. First, the majority acknowledges that the issue is whether Garcia was a domiciliary of Maryland on the date of the accident, December 13, 1991,[1] but then in concluding he was a domiciliary on that date, the majority apparently relies on subsequent presidential directives which occurred long after Garcia's accident and which could not have been anticipated by Garcia in 1991.[2] Second, the majority fails to

---

1. Maryland cases clearly establish that, when determining whether a claimant is a "qualified person" under Maryland Code (1957, 1994 Repl.Vol.), Article 48A, § 243(H)(a)(1), we must determine the claimant's domicile as of the date of the accident. *See, e.g., Hawks v. Gottschall,* 241 Md. 147, 152–53, 215 A.2d 745, 748–49 (1966); *Maddy v. Jones,* 230 Md. 172, 174, 186 A.2d 482, 482 (1962); *Holly v. Maryland Auto. Ins. Fund,* 29 Md.App. 498, 503, 349 A.2d 670, 674 (1975); *Liberty Mut. Ins. Co. v. Craddock,* 26 Md.App. 296, 300–02, 338 A.2d 363, 366 (1975).

2. The majority seems to justify using post–1991 events to determine Garcia's status in 1991 by stating: "With respect to the legal status component of the domicile issue, however, appellate courts decide cases according to the law in effect at the time of decision...." 335 Md. 475, 480, 644 A.2d 498, 501. I do not profess to understand what the "legal status component" of domicile is or why that component of domicile in 1991 is dependent on Garcia's status in 1994. The majority

recognize the importance of uniformity in determining when a citizen of another country can become a domiciliary in this country. No attempt is made to explore how other jurisdictions have decided this issue.

Garcia entered this country illegally approximately 21 months before his accident. Several months before the accident, he applied for, and received, Temporary Protected Status (TPS) and a temporary work permit. Garcia's TPS was due to be terminated and in fact was terminated on June 30, 1992, 6 months after the accident. Provision was made in the TPS statute for extensions of TPS from 6 to 18 months in the discretion of the Attorney General, *see* 8 U.S.C.S. § 1254a(b)(2) & (3) (1987, 1994 Cum.Supp.), but the Attorney General never extended TPS. Garcia was apparently not eligible for either political asylum, *see* 335 Md. at 478 n. 1, 644 A.2d at 500 n. 1, or for permanent resident status,[3] *see* 335

---

goes on to state: "We cannot predict the outcome of political judgments that are yet to be made. We can only be guided by federal law as it stands on the date of our decision. Under that law and Maryland domicile law, Garcia's intent is not an unrealistic subjective intent." 335 Md. at 488, 644 A.2d at 504. This seems to imply that, in determining whether Garcia was a domiciliary in 1991, we look at his subjective intent in 1991, but also await future events—at least up through final appellate review—to assure that his intent was and still remains "realistic."

3. The Office of General Counsel, INS, in an opinion on March 4, 1991, opined that "[a]n alien who entered the United States without inspection is ineligible for adjustment of status." 68 Interpreter Releases 483, 483 (Apr. 22, 1991). Relying on INA § 245A, 8 U.S.C. § 1255a (1987), General Counsel reasoned as follows:

"Section 245(a) provides that, in order to be eligible to adjust, the alien must have been 'inspected and admitted or paroled into the United States.' Since an alien who entered without inspection, by definition, cannot satisfy this requirement, the alien is ineligible for adjustment. In providing temporary protected status to El Salvadorans, Congress made specific requirements that the statutory protection would be limited to 18 months and specific rules were incorporated in the statute to ensure the removal of these aliens following termination of the designated period. As further evidence that Congress did not intend undocumented aliens granted temporary protected status to be able to adjust their status in the United States, [the Immigration Act of 1990] included a statutory limitation on the ability of Congress to consider legislation adjusting the status of any

Md. at 488, 644 A.2d at 504. Thus, Garcia's TPS immigration status expired, as per the act conferring that status, approximately 6 months after the accident. The only reason Garcia did not revert to his status as an illegal alien subject to immediate deportation was because of presidential directives which could not have been anticipated by Garcia and which changed his status from TPS to Deferred Enforced Departure (DED). These subsequent unanticipated presidential directives should not *nunc pro tunc* modify Garcia's status or intent as of December 13, 1991. Although I do not believe the Court should determine Garcia's domicile on December 13, 1991 by using subsequent unanticipated events, there are other valid reasons for concluding that Garcia was a domiciliary of Maryland on that date.

There could be severe consequences when we require aliens to maintain a foreign domicile in countries to which they never wish to return and deny them domicile in states where they reside and fervently hope to make their permanent homes. The comments to the *Restatement (Second) of Conflict of Laws* (1988 Revisions) point out the importance of domicile:

"The functions served by domicil in Conflict of Laws fall into three broad categories. These are judicial jurisdiction; choice of law, particularly in matters where continuity of application of the same law is important, as family law and decedents' estates; and governmental benefits and burdens.

A state may exercise judicial jurisdiction to render through its courts a personal judgment against its domiciliaries whether or not they happen to be within its territory at the time of service of process (see § 29). The state where at least one of the spouses is domiciled at the time of

---

alien provided temporary protected status. INA § 244A(h), 8 U.S.C. § 1254a." (Citation omitted).
*Id.* at 485.

8 U.S.C. § 1254a(h), § 302(h) of the 1990 Act, provides in relevant part that, without a three-fifths vote of all of the senators "duly chosen and sworn," it is not "in order" to consider any bill that "provides for adjustment to lawful temporary or permanent resident alien status for any alien receiving temporary protected status under this section...."

suit may terminate their marriage by divorce (see § 71); such a state may likewise issue a decree of judicial separation (see § 75) or of annulment (see § 76). In the area of choice of law, the law of a person's domicil may determine such matters relating to his personal status as the validity of his marriage (see § 283) and his legitimacy (see § 287). The same law governs the transfer of his movable property upon death; it determines the validity of his will with respect to such property (see § 263) or its distribution in the event of intestacy (see § 260).   * * * "

§ 11 cmt. c at 1–2 (commenting on subsection 1). *See, e.g.,* Maryland Code (1984, 1991 Repl.Vol.), Family Law Article, § 7–101 (nonresidents may be denied access to the courts for divorces).

There is an obvious benefit to uniformity in the determination of whether aliens who reside in and intend to remain in this country may become domiciliaries in this country. For this reason I believe it is important to examine and be guided by what federal and other state courts have decided in analogous cases.

In *Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982), the Supreme Court held that the Equal Protection Clause was applicable to illegal aliens. In doing so, the Court noted the plight of illegal aliens as follows:

"Sheer incapability or lax enforcement of the laws barring entry into this country, coupled with the failure to establish an effective bar to the employment of undocumented aliens, has resulted in the creation of a substantial 'shadow population' of illegal migrants—numbering in the millions—within our borders. This situation raises the specter of a permanent caste of undocumented resident aliens, encouraged by some to remain here as a source of cheap labor, but nevertheless denied the benefits that our society makes available to citizens and lawful residents. The existence of such an underclass presents most difficult problems for a Nation that prides itself on adherence to principles of equality under law." (Footnotes omitted).

*Plyler,* 457 U.S. at 218–19, 102 S.Ct. at 2395–96, 72 L.Ed.2d at 800.

In addition to holding that illegal aliens are entitled to equal protection under the law, the Supreme Court made some observations which indicate illegal aliens should be able to establish domicile even though potentially subject to immediate deportation:

> "To be sure, like all persons who have entered the United States unlawfully, these children are subject to deportation. But there is no assurance that a child subject to deportation will ever be deported. An illegal entrant might be granted federal permission to continue to reside in this country, or even to become a citizen. In light of the discretionary federal power to grant relief from deportation, a State cannot realistically determine that any particular [illegal alien] will in fact be deported until after deportation proceedings have been completed." (Citations omitted).

*Plyler,* 457 U.S. at 226, 102 S.Ct. at 2399, 72 L.Ed.2d at 805. In interpreting the impact of the *Plyler* case, a recent article stated that "in *Plyler v. Doe,* the Court recognized that the alien's lack of initial immigration approval did not undercut her ability to participate in and become integrated into the society.... Indeed, the Court's analysis exemplified the premise that modern jurisprudence holds for further extending the positive rights of participation due the alien." *Developments in the Law—Immigration Policy and the Rights of Aliens,* 96 Harvard L.Rev. 1286, 1311 (1983) (footnote omitted).

Certainly a person with TPS is in a better position to acquire domicile than an illegal alien who is subject to deportation immediately upon discovery. Although we need not, and should not, decide whether all classes of illegal aliens may establish domicile in this country, several courts have declared that an illegal alien can establish domicile within this country. For example, in *United States v. Otherson,* 480 F.Supp. 1369 (S.D.Cal.1979), the federal district court stated the following:

"The law is well-established that a person acquires a legal 'domicile' when he is physically present in a location with the intent to remain for the indefinite future. *Restatement (Second) of Conflict of Laws*, § 15 (1971). The aliens seemingly had the requisite intent. As for the requirement of physical presence, it has been held that the presence of illegal aliens is sufficient to enable them to establish a legal 'domicile.' *Rzeszotarski v. Rzeszotarski*, 296 A.2d 431 (D.C.App.1972); *Seren v. Douglas*, 30 Colo.App. 110, 489 P.2d 601 (1971). A fugitive from justice can establish a legal 'domicile' where he is in hiding. *Young v. Pollak*, 85 Ala. 439, 5 So. 279 (1888). Additionally, many cases hold that the individual need only be present for a moment. *E.g., Winans v. Winans*, 205 Mass. 388, 91 N.E. 394 (1910); *White v. Tennant*, 31 W.Va. 790, 8 S.E. 596 (1888); *Restatement (Second) of Conflict of Laws*, § 16 (1971)."

480 F.Supp. at 1371 n. 4.

In *St. Joseph's Hosp. v. Maricopa County*, 142 Ariz. 94, 688 P.2d 986 (1984), the Supreme Court of Arizona held that even an illegal alien who was subject to deportation when caught could establish domicile in Arizona. The Arizona court quoted the following from the Supreme Court's opinion in *Plyler v. Doe*:

" 'In light of the discretionary federal power to grant relief from deportation, a State cannot realistically determine that any particular undocumented [person] will in fact be deported until after deportation proceedings have been completed.' *Plyler v. Doe*, 457 U.S. 202, 226, 102 S.Ct. 2382, 2399, 72 L.Ed.2d 786[, 805] (1982) (the bracketed words are substituted for the words 'child' or 'children' in the original)."

*St. Joseph's Hosp.*, 142 Ariz. 94, 688 P.2d at 991. The *St. Joseph's Hosp.* court went on to conclude:

"Given these words from the nation's highest court concerning a field of federal legislation, it is unnecessary to pursue the matter further. There is no federal impediment to an undocumented alien becoming a resident of an Arizona

county. We have been cited to no state law which would create such an impediment."

*St. Joseph's Hosp.*, 142 Ariz. 94, 688 P.2d at 992. *See also Cabral v. State Bd. of Control*, 112 Cal.App.3d 1012, 169 Cal.Rptr. 604, 607 (Cal.Ct.App.1980) (holding that an alien who entered this country illegally from Mexico could establish domicile).

Many other state courts have held that aliens in situations analogous to Garcia's have established domicile in this country. In *In re Marriage of Dick*, 15 Cal.App.4th 144, 18 Cal.Rptr.2d 743 (Cal.Ct.App.1993), a California court recently held that a nonimmigrant alien in this country on a tourist visa, who was required by his visa to leave the country within six months, although permitted to re-enter, could nevertheless establish domicile in the State. The court noted the following as to the state of the law:

"[T]he cases cited to us, and those which we have found, from other jurisdictions hold that immigration status is, at most, evidence of domiciliary intent, but not dispositive of the residency issue as a matter of law. These cases hold that a party's nonimmigrant alien status does not bar that party from establishing domicile for purposes of a dissolution statute. (*Alves v. Alves* (D.C.App.1970) 262 A.2d 111; *Rzeszotarski v. Rzeszotarski* (D.C.App.1972) 296 A.2d 431; *Cocron v. Cocron* (1975) 84 Misc.2d 335, 375 N.Y.S.2d 797; *Abou–Issa v. Abou–Issa* (1972) 229 Ga. 77, 189 S.E.2d 443; *Bustamante v. Bustamante* (Utah Sup.Ct.1982) 645 P.2d 40; *Nicolas v. Nicolas* (Fla.App.1984) 444 So.2d 1118; *Pirouzkar v. Pirouzkar* (1981) 51 Or.App. 519, 626 P.2d 380; *Williams v. Williams* (D.St.Croix 1971) 328 F.Supp. 1380). We agree with the reasoning of these cases on this issue."

*In re Marriage of Dick*, 15 Cal.App.4th 144, 18 Cal.Rptr.2d at 746–47.

*Bustamante v. Bustamante*, 645 P.2d 40 (Utah 1982), is a case quite similar to the instant case. The plaintiff was a Salvadoran citizen who came to this country on a visitor's visa which was due to expire on June 21, 1980, but was extended to

December 31, 1980. The issue in the case was whether the plaintiff was a domiciliary of Utah on July 14, 1980, when she filed a divorce action. She testified she intended to live in this country for the rest of her life, and after filing for divorce, stated that she sought to change her status to that of political asylum. The Utah Supreme Court

> "emphasize[d] that a visa application or renewal form indicating a date certain for return to one's home country is not necessarily inconsistent with an actual conditional intent to establish permanent residency in the United States, if possible, by means of renewals and extensions of one's nonimmigrant status or attainment of immigrant status.

> \*     \*     \*     \*     \*     \*

> Even if the plaintiff's professed intention to establish an actual and bona fide residency is inconsistent with the terms of her right of entry into the United States, she is not thereby disqualified from becoming a domiciliary for divorce purposes."

*Bustamante*, 645 P.2d at 42. The court went on to hold that an alien may establish domicile based on a " 'dual intent'—to remain if that may be accomplished and at the same time an intent to leave if the law so commands." *Id.*

In *Babouder v. Abdennur*, 41 Conn.Sup. 258, 566 A.2d 457 (Conn.Super.Ct.1989), at issue was whether the plaintiff was a domiciliary of Connecticut when she filed her action for divorce. When the plaintiff came to the United States, she was required to swear that she was a resident of Lebanon and intended to return there when her visa expired. She was issued a "B–1 Business Visa" with an authorized stay of six months. *Abdennur*, 41 Conn.Sup. 258, 566 A.2d at 460. One six-month extension is allowed for a B–1 Business Visa, and the plaintiff had received this extension when her divorce proceeding was filed. The court held that the plaintiff was a domiciliary because she intended to reside in Connecticut permanently, even if her immigration status might not permit carrying out this intent. The court recognized the existence of a " 'dual intent,' namely intent to remain if that could be

accomplished, or intent to leave if required by law...." *Abdennur*, 41 Conn.Sup. 258, 566 A.2d at 461. Such "dual intent" was deemed sufficient to establish domicile for the purpose of filing for divorce.

In *Williams v. Williams*, 328 F.Supp. 1380 (D.C.V.I.1971), the federal district court stated:

"[W]here an alien has misrepresented his true intent at the time he was granted entry to the country, the fact that he may be illegally in the country and deportable would not preclude him from forming an actual intent to make his home here. I see no reason to erect from the immigration laws an insuperable barrier of 'constructive' intent in divorce litigation that cannot be overcome even by proof of a person's actual intent. The enforcement of immigration laws properly remains with those to whom it is entrusted by law and does not need in aid of enforcement the judicially created civil disability of exclusion from [establishing domicile for the purpose of divorce]."

*Williams*, 328 F.Supp. at 1383.

In *Sinha v. Sinha*, 341 Pa.Super. 440, 491 A.2d 899 (1985), *rev'd on other grounds*, 515 Pa. 14, 526 A.2d 765 (1987), the issue was whether the plaintiff was a domiciliary of Pennsylvania when he filed an action for divorce. The plaintiff was in this country on an H–1 visa as a temporary worker. His visa required him to maintain a permanent residence abroad "which he [had] no intention of abandoning." *Sinha*, 491 A.2d at 900. In determining that the plaintiff was a Pennsylvania domiciliary, the court said: "Even if [the plaintiff's] alleged intent to establish permanent residency in Pennsylvania is inconsistent with the terms of his right of entry into the United States, he is not automatically precluded from becoming a domiciliary of the Commonwealth." *Sinha*, 491 A.2d at 901. Analogously, in *Pirouzkar v. Pirouzkar*, 51 Or.App. 519, 626 P.2d 380 (Or.Ct.App.1981), the Oregon Court of Appeals held that the plaintiff was domiciled in Oregon, and it stated the following:

"Although it may be true, as husband contends, that wife may be deported by the immigration authorities at any time, that has apparently been her status for most of the time she has been in this state. The enforcement of the immigration laws is the function of the federal government. We have no way of knowing when, if ever, wife may be required to leave this country. In the meantime, we see no reason to deny her access to the courts of this state for the purposes of dissolution of the marriage between the parties."

*Pirouzkar,* 51 Or.App. 519, 626 P.2d at 384.

In *Das v. Das,* 254 N.J.Super. 194, 603 A.2d 139 (N.J.Super.Ct.Ch.Div.1992), the court held that, even though the alien-plaintiff's visitor's visa had expired, and she had withdrawn her request for political asylum, she could still establish domicile in this country. The court stated that, "[a]lthough an alien who fails to maintain the conditions attached to a status may be deportable, given the uncertainty of knowing when, if ever, deportation proceedings will be commenced, this court is persuaded that no legal disability precluding a change of domicile should exist." *Das,* 603 A.2d at 142 (footnote omitted). The court also noted that "[t]he conclusion that federal immigration law does not preclude a state from allowing nonimmigrant aliens to establish a new domicile, is also in accord with the overwhelming weight of authority in other jurisdictions." *Id.* (Citations omitted).

In *Rzeszotarski v. Rzeszotarski,* 296 A.2d 431 (D.C.1972), *overruled on other grounds by Bazemore v. Davis,* 394 A.2d 1377 (1978), the issue was whether the plaintiff had established domicile in the District of Columbia. The plaintiff came to this country on a two-year visa as part of a cultural/scientific exchange program, and under that program, he was not permitted to remain for any indefinite future time. After his visa expired, the plaintiff filed a divorce proceeding in the District of Columbia where he claimed to be a domiciliary. The court held that, although the plaintiff was subject to immediate deportation, and his intent to remain in this country was a "floating intent or even contingent upon being allowed to stay in the United States," *Rzeszotarski,* 296 A.2d

at 436 (footnote omitted), he was not precluded from being a District of Columbia domiciliary.

In *Perez v. Perez*, 164 So.2d 561 (Fla.Dist.Ct.App.1964), the Florida Supreme Court held that a refugee from communist Cuba who came to this country, and intended to remain here until Cuba is no longer communistic, may become a domiciliary of the State. The *Perez* court quoted two treatises as follows:

> " 'Domicil, of course, cannot be changed by [a] forced exile, or by a change made necessary in order to secure safety in time of war, as in the case of the emigration of the nobles from France at the time of the French Revolution. But where one leaves his country because of his dislike for its political condition, hoping to return when he can do so as a free citizen, but without immediate expectation of such an event, these facts are compatible with the acquisition of a domicil in the country to which he goes.' " (Citations omitted) (footnotes omitted).

164 So.2d at 563–64 (quoting 1 Joseph H. Beale, *Conflict of Laws* § 21.1 at 154 (1935)); and

> " 'A person who resides in the country from which he is liable to be deported may lack the *animus manendi* because his residence is precarious. But if in fact he forms the necessary intention, he acquires a domicile of choice. This applies both where he is given permission to reside for a limited period but is liable to deportation and also where he is given permission to reside for a limited period which can be extended at the discretion of the authorities of the country in question. Once such a person has acquired such a domicile choice he does not lose it merely because a deportation order has been made against him; he only loses it when he is actually deported. * * * ' "

164 So.2d at 564 (quoting A.V. Dicey, *Conflict of Laws*, Rule 9.2 (7th ed.)).

Based on the persuasive authority of these cases as they relate to Garcia's TPS immigration status, I concur in the holding that Garcia was a domiciliary of Maryland on Decem-

**500**

ber 13, 1991. The subsequent, unanticipated presidential directives conferring DED immigration status on Garcia seem to have little relevance to Garcia's intent or how realistic that intent was on December 13, 1991.

Judge BELL has authorized me to state that he joins in the views expressed in this concurring opinion.